295 N.J. Super. 147 (1996)
684 A.2d 961
DAVID L. KERR AND GAIL L. KERR, PLAINTIFFS, AND TIMOTHY S. HALEY, ESQ., APPELLANT,
v.
ABLE SANITARY AND ENVIRONMENTAL SERVICES, INC., MICHAEL FAUL, ANDOVER ENVIRONMENTAL ENGINEERING, INC. AND BRUCE GALLO, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1996.
Decided November 15, 1996.
*149 Before Judges BROCHIN, KESTIN and EICHEN.
Wayne D. Greenstone argued the cause for appellant (Greenstone & Greenstone, attorneys; Patrick D. Tobia of Clemente, Dickson & Mueller, P.A., on the brief).
Thomas J. Spies argued the cause for respondents Able Sanitary and Environmental Services, Inc. and Michael Faul (Walder, Sondak & Brogan, P.A., attorneys; Michael J. Faul on the brief).
Thomas P. Scrivo argued the cause for respondents Andover Environmental Engineering, Inc. and Bruce Gallo (McElroy, Deutsch & Mulvaney, attorneys; relying on brief filed on behalf of respondents Able Sanitary and Environmental Services, Inc. and Michael Faul).
*150 No other parties participated in this appeal.
The opinion of the court was delivered by EICHEN, J.A.D.
In this consumer fraud/professional negligence action, plaintiffs David L. Kerr and Gail L. Kerr sued defendant Able Sanitary and Environmental Services, Inc. (Able), a remediation excavation contractor, and Andover Environmental Engineering, Inc. (Andover), an environmental engineering company, and two of their principals, alleging that defendants misrepresented the extent of work necessary to clean up and remediate plaintiffs' property as a condition for obtaining a "no further action" letter[1] from the New Jersey Department of Environmental Protection (NJDEP).
Plaintiffs are the former owners of residential property in Essex Fells. Plaintiffs contracted to sell the property in March 1994. As a condition of sale, the prospective purchasers required plaintiffs to remove an underground storage tank on the property and to provide proof that the tank had been removed in accordance with governmental regulations, including proof that no discharge into the soil had occurred.
During the pendency of the action, counsel for plaintiffs, Timothy Haley, apparently initiated a discussion about the case with a reporter at The Star-Ledger, who was preparing an article concerning unscrupulous contractors active in the remediation field. Haley also communicated with representatives of the NJDEP regarding the status of plaintiffs' property. Based on these occurrences, defendants concluded Haley had "independent knowledge" concerning the events giving rise to the action and served *151 him with a subpoena commanding him to appear for a deposition and to produce documents.
The Law Division refused to quash the subpoena and, without making any specific findings of fact concerning defendants' allegations of "independent knowledge" or indicating the legal standard the court was applying, granted defendants' cross-motion to enforce the subpoena, subject to certain protective measures. In so ruling, the court stated as follows:
[Haley] has acted far more than an attorney representing someone and he has done a lot of things that have made this Court suspect of not any bad intentions, but of the manner of certain information being obtained. I think that for clients to be adequately represented on all sides, people have to know where information is coming from, how it is being filtered, how it is being used. And when Mr. Haley is going to make statements to the press that his client denies he has any knowledge of and say that he openly goes and asks the press information, makes me very suspect of what is going on.
* * * * * * * *
I had a feeling about this case that is very disconcerting. And I think that any lawyer worth [his salt] in this state would not be talking to the press. And this is by no means meaning no disrespect to the press.
* * * * * * * *
I am making no findings as to what has gone on. It is just that I have become very suspect as to the way this litigation is going on.... And I would caution everybody to stay away from the press.
We granted Haley leave to appeal from the Law Division order. For the reasons discussed below, we reverse.
We review the background circumstances in some detail so that the parties' arguments can be better understood. In November 1993, plaintiffs engaged Able's excavation services to remove the storage tank from the property. Upon its removal, holes were discovered in the body of the tank and, consequently, Able recommended further investigation to determine whether soil contamination had occurred. On Able's recommendation, plaintiffs retained Andover to perform soil testing. Andover is an engineering company providing project management for soil and groundwater remediation, including designing systems and operations for such purposes. Ultimately, Andover and Able performed *152 significant remediation work, including removal of 350 tons of soil and the installation of a carbon filtration system, contending the system was necessary to clean up the contamination caused by oil leakage into the groundwater. Plaintiffs contend that they expended in excess of $70,000 to clean up the property and that much of the expense was unnecessary.
On September 23, 1994, plaintiffs filed an unverified complaint in the Superior Court alleging that they obtained a "no further action letter" from the NJDEP without the carbon filtration system being operated. After filing the complaint, plaintiffs arranged to sell the carbon filtration system to a third party in order to mitigate their damages. According to plaintiffs, they learned for the first time from the prospective purchaser in November 1994 that "the system had been operated" and "that approximately 53,000 gallons [of water] had been run through."[2]
When Haley advised defendants of plaintiffs' intention to sell the system, defendants purportedly visited the property to inspect the filtration system on November 21, 1994, and allegedly discovered that it had been operated. Defendants then applied to the Law Division for a temporary restraining order seeking to prevent the sale of the system. As part of their application, defendants alleged that the system had been operated without a permit in violation of New Jersey's environmental laws. Upon learning of this allegation, Haley immediately reported the alleged unlawful discharge at the property to Debra Cowell, the NJDEP case manager assigned to monitor site remediation compliance at the property.[3] Cowell apparently advised Haley to call and report the discharge to the Metro Water and Hazardous Waste Enforcement Unit because her bureau's responsibilities did not include recording *153 unauthorized discharges. In his certification, Haley asserts that he then reported the discharge to the appropriate unit by telephone. He contends that both telephone conversations occurred on November 23, 1994.
On December 25, 1994, The Star-Ledger published an article concerning "unscrupulous clean up contractors." Haley was quoted in the article as follows:
Later, when Kerr was about to complete the sale of his home, the carbon filtration system was found to have been operated and approximately 53,000 gallons of water run through the unit, according to his attorney, Timothy Haley. Who ran it is a matter of dispute.
In support of their cross-motion to enforce the subpoena, defendants relied upon this alleged statement to the reporter to advance defendants' claim that Haley knew as early as March 1994, prior to filing the complaint in September 1994, that the carbon filtration system had been operated, despite his allegations in the complaint to the contrary. Haley denied having any knowledge of the operation of the system prior to November 1994, asserting in his certification that:
Mr. and Mrs. Kerr closed on the sale of their house in March of 1994. At no point did I tell The Star-Ledger, or anyone else for that matter, that the operation of the system had been discovered at about the time of the sale. What has been said, as is indicated in plaintiffs' answers to defendants' interrogatories, is that it was discovered at about the time the station was sold by plaintiffs to a third party that it had been operated. Who operated it, when it was operated and where it was operated are the subject of dispute in this case.
Thus, Haley maintained that the media had mistakenly confused the date of the sale of the house with the date of the sale of the system in reporting the date plaintiffs first learned the that system had been operated. In his certification, Haley asserted he did not know plaintiffs in March 1994 when the house was sold, that he did not meet them and was not retained as their attorney until August 1994. Finally, Haley asserted that, aside from the third party purchaser's advice in November 1994 to his clients that the system had been operated, and the representations by defendants in their application for the restraining order, he has no *154 independent knowledge concerning the alleged operation of the system.
Defendants challenge Haley's disclaimer of knowledge as not credible, pointing to his conversation with Cowell of the NJDEP. They assert this conversation occurred in June or July 1994 and is evidence that Haley knew the system had been operated before he filed the complaint alleging to the contrary. Defendants rely on a certification of Cowell which was submitted in support of their cross-claim to enforce the subpoena. In the certification, Cowell asserted that
[t]o the best of my recollection, shortly before the issuance of the No Further Action ("NFA") Letter or in or about June or July, 1994, Timothy Haley, the attorney for the homeowner, David Kerr, contacted me and then advised that the carbon filtration system installed at the Kerr residence may have been operated.
The record also reflects, however, that Cowell submitted a subsequent certification in which she qualified her statement concerning the timeframe in which she spoke with Haley:
I thought I had spoken to Mr. Haley prior to the issuance of the NFA[.] I am not sure exactly when I spoke to him. This is why the certification reads "to the best of my recollection."
On appeal, Haley continues to maintain that he "ha[s] no factual knowledge in this case ... and no personal knowledge of the underlying facts." Relying on the statement in The Star-Ledger and Cowell's initial certification, defendants reiterate their position that Haley "is a pivotal fact witness who has independent knowledge concerning facts which go to the heart of the serious broad claim involving the carbon filtration system," thus justifying their entitlement to take his deposition.
The question of whether and under what circumstances an adversary attorney's deposition may be obtained has not been directly addressed by any court in this state. Suffice it to say, there is no general prohibition against obtaining the deposition of opposing counsel regarding relevant, non-privileged information. R. 4:14-1 provides that "any party may take the testimony of any person including a party by deposition." Thus, the court rule on its face would permit taking the deposition of opposing counsel in *155 an underlying case provided, however, that the discovery sought "is relevant to the subject matter involved in the pending action." R. 4:10-2(a).
Despite the apparent permissiveness of the rule, however, we are mindful that attorney depositions frequently interfere with the adversarial process by inviting delay, disruption, harassment, and perhaps even disqualification of the attorney from further representation of the client in the underlying litigation. Hence, we are convinced that an order requiring adverse counsel to submit to a deposition must rest on a clear determination that the information sought is not only relevant, but is within the proponent's legitimate discovery needs as determined in the context of the particular case.
Rule 4:10-3 provides the means by which a person, including a party's attorney who objects to a deposition, can obtain protection against improper intrusion into the adversarial process by an improvidently issued deposition subpoena. That rule states in relevant part: "Upon motion ... by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect [the] ... person from annoyance, embarrassment, oppression, or undue burden or expense...."[4]
Implicit in R. 4:10-3 is the notion that the movant bears the burden of persuading the court that good cause exists for issuing the protective order. See D'Agostino v. Johnson & Johnson, 242 N.J. Super. 267, 281, 576 A.2d 893 (App.Div.) ("Under R. 4:10-3, the burden is clearly on the person to be deposed to show that a protective order is necessary ...."). However, in situations involving a request to depose an opposing party's attorney, there *156 are good reasons for shifting the burden to the proponent of the deposition to demonstrate the propriety and need for the deposition. Because R. 4:10-3 follows the text of Fed.R.Civ.P. 26(c),[5] federal decisions construing the corresponding federal rule offer some insight into the issue. See Hammock by Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 369, 662 A.2d 546 (1995).
A number of federal courts take the view that attorney depositions should be treated like any other depositions under the federal rules, and consequently place the burden of demonstrating good cause on the party seeking the protective order. See, e.g., Rainbow Investors Group, Inc. v. Fuji Trucolor Missouri, Inc., 168 F.R.D. 34, 36 (W.D.La. 1996); United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245, 247-48 (D.Kan. 1995); Frazier v. Southeastern Pennsylvania Transp. Authority, 161 F.R.D. 309, 313 (E.D.Pa. 1995); Blum v. Schlegel, 150 F.R.D. 38, 41 (W.D.N.Y. 1993); Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578, 130 F.R.D. 348, 352 (D.N.J. 1990). In these federal courts, the party seeking the protective order must make "a particular and specific demonstration of fact, as distinguished from general, conclusory statements, revealing some injustice, prejudice, or consequential harm that will result if the protection is denied." Blum, supra, 150 F.R.D. at 41 (citations omitted); see also Johnston, supra, 130 F.R.D. at 352. The theory supporting this approach is based upon the notion that deposition-discovery rules are to be accorded broad and liberal treatment, and that there exists no general rule prohibiting the deposition of opposing counsel regarding relevant, non-privileged information. See, e.g., *157 Rainbow Investors Group, Inc., supra, 168 F.R.D. at 36; United Phosphorus, Ltd., supra, 164 F.R.D. at 247-48.
Other federal courts have employed a different approach under Fed.R.Civ.P. 26(c) when the proposed deponent is an attorney, recognizing the potential negative impact of attorney depositions on the adversarial process. In particular, these courts adhere to the principle that an opposing counsel's deposition should be permitted only in limited circumstances, concluding that "the party seeking to depose another party's attorney must demonstrate the propriety and need for the deposition." American Cas. Co. of Reading, Pa. v. Krieger, 160 F.R.D. 582, 585 (S.D.Cal. 1995) (citing Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir.1986); Harriston v. Chicago Tribune Company, 134 F.R.D. 232, 233 (N.D.Ill. 1990); Hay and Forage Industries v. Ford New Holland, Inc., 132 F.R.D. 687, 689 (D.Kan. 1990); West Peninsular Title Company v. Palm Beach County, 132 F.R.D. 301, 302 (S.D.Fla. 1990); Advance Systems, Inc. of Green Bay v. APV Baker PMC, Inc., 124 F.R.D. 200, 201 (E.D.Wis. 1989); N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83, 84 (M.D.N.C. 1987)).
In Shelton v. American Motors Corp., supra, 805 F.2d at 1330, the Court of Appeals for the Eighth Circuit commented on the pernicious effects of the practice of compelling attorneys to submit to depositions while representing a client in the case, aptly observing that
Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent. Moreover, the "chilling effect" that such practice will have on the truthful communications from the client to the attorney is obvious.
[Ibid.]
*158 Thus, courts recognizing the problems attorney depositions present, require the "party seeking to depose an opposing party's attorney to establish a legitimate basis for requesting the deposition, and to demonstrate that the deposition will not otherwise prove overly disruptive or burdensome." Krieger, supra, 160 F.R.D. at 588 (citing N.F.A. Corp., supra, 117 F.R.D. at 85). Consequently, these courts regard the request to depose a party's attorney as constituting good cause for obtaining a protective order under Federal Rule 26(c), impliedly recognizing that the presumptive "good cause" for the protective order can be overcome only upon a showing of propriety and need for the deposition. See Krieger, supra, 160 F.R.D. at 588 n. 3 (citing N.F.A. Corp., supra, 117 F.R.D. at 85); see also West Peninsular Title Company, supra, 132 F.R.D. at 302. See generally Timothy Flynn, Jr., Note, On "Borrowed Wits": A Proposed Rule for Attorney Depositions, 93 Colum. L.Rev. 1956, 1981 (1993).
Our review of these cases persuades us that the request to depose a party's attorney itself constitutes presumptive "good cause" for a protective order under R. 4:10-3(a).[6] That presumption, however, may be overcome by the proponent of the deposition demonstrating legitimate discovery needs for the deposition. We are sensitive to the potential negative impact that too liberal a construction of our discovery rules may have on the adversarial process without such a presumption, especially where opposing counsel cannot demonstrate a legitimate need for the deposition. Because of the disruptive nature of attorney depositions, a party seeking to depose opposing counsel must demonstrate that the propriety and need for the deposition outweigh the possible disruptive or burdensome effects that the prospective deposition will have on the underlying litigation. Hence, to overcome the presumptive "good cause" we accord to the opponent of the deposition, the party requesting the deposition must show that the *159 information sought is relevant to the underlying action and is unlikely to be available by other less oppressive means.
In evaluating the propriety and need for the deposition of the opposing attorney, the court should consider the following factors: (1) the relative quality of the information purportedly in the attorney's knowledge,[7] and the extent to which the proponent of the deposition can demonstrate the attorney possesses such information; (2) the availability of the information from other sources that are less intrusive into the adversarial process, i.e., the extent to which all other reasonable alternatives have been pursued to no avail; (3) the extent to which the deposition may invade work product immunity or attorney-client privilege; and (4) the possible harm to the party's representational rights by its attorney if called upon to give deposition testimony, i.e., the extent to which the deposition will affect attorney preparation or participation on behalf of the client. Consideration of these or any other relevant factors, either singly or in combination, will determine in a particular case whether the party seeking the deposition of opposing counsel has overcome the presumptive "good cause" for the protective order. If such showing is not made, a protective order should issue.
In so holding, we are fully cognizant that there are circumstances under which a party's attorney may be compelled to submit to a deposition. For instance, where an attorney's conduct is the basis for a pending claim or defense, or where an attorney is a fact witness in the sense that the attorney has observed or participated in the underlying transaction or occurrence giving rise to the cause of action,[8] the presumption in favor of a protective *160 order may be overcome. However, where an attorney has no first-hand knowledge or direct involvement in the events giving rise to the action, or any information other than that discovered from his or her client during their professional relationship or developed from discovery conducted during the litigation, a protective order will likely be justified.
Applying these principles to the facts of the instant appeal, we conclude that defendants have failed to overcome the presumptive "good cause" for the protective order by showing the propriety and need for Haley's deposition. Specifically, defendants failed in their efforts to demonstrate that Haley had information of sufficient quality to justify allowing intrusion into his relationship with his clients. Given Haley's explanation and denial of any knowledge of independent facts concerning operation of the carbon infiltration system, and defendants' inability to present more than mere speculation and suspicion that Haley's assertions are not as he claims, defendants have not established that the relative quality of information in his knowledge as reflected in the article in The Star-Ledger or his report of the discharge to the NJDEP is within defendants' legitimate discovery needs. Haley adequately explained the apparent inconsistencies between the timeframes, thus dispelling any rationally-based notion that the information he had about the operation of the filtration system was anything other than client-derived or learned from defendants' in-court disclosures. Haley's purported statements evince no knowledge of how the filtration system may have come to be operated, assuming it was, beyond what he might have learned through his participation in the case as counsel to plaintiffs. In fact, the statement reported in The Star-Ledger did nothing more than assert a factual development that the system had been operated at the time it was sold to the third party subsequent to the filing of the complaint. Viewed in this light, and on these facts, there is *161 nothing that Haley could properly be deposed about with respect to which he may have had independent factual knowledge which would not oblige him to invoke the attorney/client or work product privileges. To permit the deposition to go forward on such an insubstantial showing would have the effect of allowing opposing counsel to disrupt and delay the underlying litigation by simply asserting that counsel does not believe Haley's disclaimer of first-hand knowledge, without providing a rational basis for that disbelief.
Defendants should not be able, absent a more particularized showing, to roam afield into opposing counsel's knowledge or the sources of that knowledge. If defendants have reason to believe that the filtration system was unlawfully operated, they should develop that factual theory by their own efforts and investigation, not by deposing plaintiffs' counsel. Notably, defendants have not deposed plaintiffs or Cowell, or even attempted to speak informally to the newspaper reporter. See N.F.A. Corp., supra, 117 F.R.D. at 86 (expressing that party seeking to depose opposing counsel should first attempt to discover the sought after information by deposing "other persons available who have the information"). Therefore, defendants have not demonstrated that the information they seek to uncover from Haley would not be available by other less oppressive means. Should further discovery provide a more substantial basis for concluding that Haley has information of sufficient quality to justify allowing intrusion into his client relationship, an order compelling his deposition might be appropriate. At this juncture, however, defendants have not overcome the presumptive "good cause" for the protective order.
Our ruling should not be read to suggest that the court was without reason to disapprove of Haley's conduct in initiating communication with The Star-Ledger reporter, or to question Haley's excuse that he was only seeking information. But, if the attorney's conduct was improper, a lesser sanction would have been more appropriate than punishing him and his clients through compelling his deposition. To the extent the court had other *162 unarticulated reasons for allowing the deposition to go forward, we are unable to discern those reasons from the record or from the court's decision. Accordingly, we cannot evaluate their merits. See R. 1:7-4. On this record, however, there is insufficient justification for requiring Haley to submit to a deposition.
In sum, we hold that Haley's deposition should not have been compelled where defendants failed to demonstrate a greater likelihood that Haley had first-hand knowledge, or direct involvement in the events giving rise to the action, or any other facts that might have established that the deposition was essential to prevent injustice. Accordingly, defendants have failed to make a sufficient showing of propriety and need for Haley's deposition in order to overcome the presumptive "good cause" for a protective order under R. 4:10-3.
Reversed.
NOTES
[1] N.J.S.A. 58:10B-1 defines a "no further action letter" as:

a written determination by the [NJDEP] that based upon an evaluation of the historical use of a particular site, ... and any other investigation or action the department deems necessary, there are no discharged contaminants present at the site, ... or that any discharged contaminants present at the site or that have migrated from the site have been remediated in accordance with applicable remediation regulations[.]
[2] In his certification, plaintiff David Kerr denied personally operating the system or authorizing anyone else to do so.
[3] Haley, a former attorney for the NJDEP, asserts he called the NJDEP in order to comply with N.J.S.A. 58:10-23.11e (requiring immediate notice to the NJDEP of all discharges of hazardous substances).
[4] In this case, plaintiffs' attorney moved to quash the deposition subpoena. We consider such motion to be the equivalent of a motion for a protective order under R. 4:10-3.
[5] Fed.R.Civ.P. 26(c) states in relevant part:

Upon motion by a party or by the person from whom discovery is sought, ..., and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including on or more of the following: (1) that the disclosure or discovery not be had; ...
This rule is almost identical to R. 4:10-3(a).
[6] See Coffman v. Keene Corp., 133 N.J. 581, 597, 628 A.2d 710 (1993) (recognizing that certain presumptions are "artificial" and "created to reach public-policy objectives").
[7] For example, a deposition concerning "central factual issues, rather than peripheral concerns, would weigh more heavily [in favor of conducting the deposition]." Johnston, supra, 130 F.R.D. at 353 (citing Walker v. United Parcel Services, Inc., 87 F.R.D. 360, 362 (E.D.Pa. 1980)).
[8] However, "[a] recollection of an event witnessed by fifty other persons would be readily obtainable from many others, and the attorney's testimony would likely be duplicative; the attorney's conversation with one or two other persons, however, gives rise to a more unique perspective." Johnston, supra, 130 F.R.D. at 353.