841 A.2d 974 (2004)
366 N.J. Super. 597
Carolyn IL GRANDE and Alexander Il Grande, her husband per quod, Alexis Anne Il Grande, an infant by her Guardian ad litem, Carolyn Il Grande, individually and in their own right, Plaintiffs-Appellants,
v.
Robert DiBENEDETTO, M.D., Defendant-Respondent, and
M. Horn, M.D. (first name unknown) and St. Barnabas Medical Center, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2003.
Decided February 19, 2004.
*977 Cynthia A. Matheke, Roseland argued the cause for appellants (Lum, Danzis, Drasco & Positan, attorneys; Dennis J. Drasco, Ms. Matheke and Lisa A Firko, of counsel; Kevin J. O'Connor and Erik C. Acosta, on the brief).
Thomas J. Pyle, Jr., argued the cause for respondent (Post, Polak, Goodsell, MacNeill & Strauchler, attorneys; Mr. Pyle, on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD. *975
*976 The opinion of the court was delivered by CARCHMAN, J.A.D.
This appeal requires us to consider whether a defendant doctor is entitled to compel a plaintiff to undergo an invasive procedure to allow the doctor to defend the underlying medical malpractice action. We hold that such an application requires a motion judge to carefully balance whether the probative value of the proposed invasive procedure outweighs any danger or extraordinary discomfort to plaintiff that may be associated with the procedure. Where a R. 4:19 medical examination involves an invasive procedure, we conclude that if plaintiff moves for a protective order, R. 4:10-3 and R. 4:19, the burden of coming forward to establish the probative value of such procedure rests with defendant; plaintiff then must produce evidence that the proposed procedure presents a risk to plaintiff's health or is of such a nature that it will create substantial discomfort or distress; thereafter, the burden shifts back to defendant to establish the safety and reasonableness of the procedure. The judge must then engage in the weighing process that we have described, and if the judge concludes that the benefits outweigh the risks as we define them, the judge may issue an appropriate order having due regard for plaintiff's safety and comfort. In all instances, the judge must consider whether such application or objection is made in good or bad faith.[1]
We reverse and remand. We conclude that here, the motion judge failed to consider all of the appropriate factors and to make sufficient findings, and thus did not adequately engage in this weighing process. We further conclude that she abused her discretion when she barred plaintiff's claim if plaintiff failed to submit to the procedure. We hold that a defendant's remedy, where defendant has failed to meet his burden to compel such an examination, is to challenge plaintiff's expert on cross-examination. Where a plaintiff fails to submit to an invasive procedure that a judge has determined to be warranted, possible remedies include, but are not limited to, questioning both parties' experts as to the nature of the proposed procedure and commenting to the jury as to plaintiff's refusal to submit to the procedure. Only in the exceptional case may a judge impose the sanction of barring plaintiff's claim.

*978 I.
On October 31, 1997, Plaintiff Carolyn Il Grande[2] underwent a caesarean section at St. Barnabas Hospital to deliver her baby. During the surgery, defendant Robert Di-Benedetto, M.D. incised plaintiff's cervix and bladder instead of the uterus, resulting in lacerations of the dome of the bladder. The incisions were noticed post-delivery and repaired by Caterina Gregori, M.D., the surgeon summoned for an intraoperative consult.
During her follow-up visits to Dr. Gregori, plaintiff was found to be "healing well," and normal recovery of plaintiff's bladder was expected; two months after the surgery, plaintiff told Dr. Gregori "that her bladder was working okay." On June 25, 1998, plaintiff complained of pain during sexual intercourse, but Dr. Gregori's medical notes indicated no complaints of "inadequate bladder capacity," frequency or painful urination either then or on plaintiff's next two visits, on December 17, 1998, and August 5, 1999. Thereafter, on October 29, 1999, plaintiff filed a complaint against defendant. Among her allegations was that defendant's negligence "caused [her] to sustain severe and permanent injury and deformity ... [and] endure great pain and suffering." On August 24, 2000, plaintiff again consulted with Dr. Gregori, complaining of "burning after urination," but offered no other complaints.
Then, on May 15, 2001, plaintiff saw Peter Boorjian, M.D., complaining of pain and burning in her left lower abdomen. Dr. Boorjian scheduled a cystoscopy and urodynamic study. Cystocopy "involves placing [a] scope into the urethra in order to visualize the bladder.... Urodynamics is the general term for the study of the storage and voiding function/dysfunction of the lower urinary tract." On June 6, 2001, Dr. Boorjian attempted to perform these studies on plaintiff in his office, but failed when "[p]assing the catheter an obstruction was met" and "[p]atient became diaphoretic[3] and anxious." In his "Pre-op History & Physical" report, Dr. Boorjian stated that plaintiff "has a significant component of anxiety associated with her experience at the time of th[e] caesarean section and this in fact may be contributing to the symptoms [of frequency and urgency incontinence] she expresses."
On July 13, 2001, plaintiff was admitted to Mountainside Hospital to complete the examination. The urodynamic study utilized gas, as the hospital was equipped with gas equipment only. Passing the catheter this time required "just a little local anesthetic." While Dr. Boorjian noted plaintiff's discomfort at the insertion, "it was accomplished and it was done twice; first to measure how much urine she had left inside her bladder after she had recently voided ... and then to pass a special type of catheter through which cystometric studies are done." Plaintiff was then placed under general anesthesia and a cystourethroscopy conducted. This study revealed "significant distortion of the usual bladder anatomy" and scarring on "the posterior wall of the bladder where the presumed suture line from prior laceration took place," but no "scarring or obstructive phenomena" of the urethra.
In his deposition, Dr. Boorjian opined that his inability to perform the studies initially was "because of a level of anxiety and fear that created so much spasm in [plaintiff's] musculature that to go and *979 force it would have hurt her." He offered no other medical basis for the failed first attempt. When asked whether he formed "any conclusions at any point in time when [he was] treating [plaintiff] as to what the cause of [her] pain was," Dr. Boorjian replied "the possibility of scar tissue that develops pain fibers, A; B, psychogenic pain; C, malingering." Dr. Boorjian also agreed that "whatever opinions that [he has] in this case with respect to what could possibly be causing the pain [he was] able to form after [he] performed the cystoscopy and urodynamic study."
After reviewing the depositions of plaintiff and defendant and various medical records, plaintiff's urological expert Sol M. Usher, M.D. opined that the "large bladder injury [that] occurred at the time of [plaintiff's] surgery ... has resulted in her having a major bladder dysfunction for the rest of her life." Dr. Usher concluded, based on his document review, that plaintiff's condition,
which she did not have prior to the caesarean section, is related to the intraoperative trauma that she had to her bladder, which resulted in subsequent decreased bladder capacity, scar tissue, distortion of her bladder as visualized at the time of cystoscopy by the urologist [Dr. Boorjian], pain, spasm, discomfort, all the things that she's complaining of.
Defendant consulted with urologist David Saypol, M.D., who advised that an independent medical examination (IME) was necessary "to determine the nature and extent of her actual damage due to the subjective nature of plaintiff's complaints." Accordingly, defendant requested plaintiff to make an appointment with Dr. Saypol for an independent cystoscopy and videotape urodynamic study. Dr. Saypol stated that "to determine if [a deformity of the bladder as described in Dr. Boorjian's report] persists, and if her voiding dysfunction is presently causally related to her surgery, I would need to perform a cystoscopic examination in the office using local lidocaine jelly anesthesia." Dr. Saypol also asserted that "a video urodynamic study with water manometrics is mandatory," as the study done by Dr. Boorjian "was a non-video study using CO2 as opposed to water," which Dr. Saypol found to "represent[] a less than adequate evaluation to determine causation." Dr. Saypol expressed his belief that he could perform the studies "with minimal discomfort to the patient," as Dr. Boorjian had indicated "no urethral abnormality" when he performed the prior cystoscopy. In response, plaintiff filed a Notice of Motion for Protective Order to deny defendant's request.
During the hearing on the motion, the judge considered:
[W]hat do I do to be ultimately fair that preservesprotects the client more than preserves the plaintiff from any invasive, you know, harm or discomfort, etc. And at the same time, give the defendant the benefit of being able to counter the allegations of an injury. And it's all well and good forand I forget which one of the experts submitted the document on behalf of the plaintiff, saying that it's a clear-cut thing. Well, how nice for him to say that. But, I mean, we all know that somebody on the other side, I mean, intellectually, the person defending it and the doctor who's being sued, he's responsible for whatever he did, no more no less. And shouldn't he be able to dispute that or, at least, see if there is a dispute.
The judge also posited a jury's adverse reaction to plaintiff if the protective order were granted and the jury told of plaintiff's refusal to submit to an IME to explain why "the defendant isn't putting any issue on." Plaintiff's counsel responded: "Well, I think that that is a risk that *980 the plaintiff would take, and we have discussed this with the plaintiff, who's adamant that the last procedure was so painful."
The judge then ordered the parties to submit additional medical information regarding the relative accuracies of using CO2 and water in a urodynamic study. The judge also requested that Dr. Saypol "in detail, indicate what it is about the distinction between the way he wants to perform the test, as opposed to the way Dr. [Boorjian] did it ... [and] whether or not his hesitancy of making an opinion is medically based with that information or legally based."
Both parties' medical submissions revealed that while both gas or liquid are permissible bladder fillings, gas is generally considered quicker and more hygienic, but that gas, which is unphysiologic and compressible, "easily provokes detrusor[4] overactivity" and "subtle changes in bladder pressure may be missed." Furthermore, "rapid fill rates achieved [by using gas] may artifactually change the normal bladder response" and "leakage is very difficult to detect due to invisibility of the gas." Using gas, "[t]he bladder capacity is often only 2/3 of the capacity measured with medium-fill water cystometry. Unstable detrusor contractions are typically seen as a gradual increase in detrusor pressure without subsequent decrease, but no essential differences exist between gas and water cystometry in the classification of qualitative data." The medical submissions also recognized the range of urodynamic procedures and recommended "more sophisticated tests [such as video-urodynamic studies] ... when the clinical examination and more simple tests are not sufficient to make an accurate diagnosis or institute treatment." Moreover, regarding cystoscopies, plaintiff's report acknowledged "the need for cystoscopy in patients with persistent symptoms of urgency and frequency, ... or voiding difficulties...."
In addition, Dr Saypol clarified the need for the procedures, stating that "Dr. Boorjian's report of his urodynamic study demonstrates no abnormalities other than reduced bladder capacity, which can be easily explained by the use of CO2 and lacks the requisite detail necessary for a proper diagnosis." Finding none of the characteristics of "a patient with multiple voiding complaints," Dr. Saypol questioned "the authenticity of the entire study and the patient's complaints."
When the motion hearing resumed, the judge explained, "the doctor has the right to have somebody of his own choosing [examine plaintiff], and a jury has the right to make that evaluation." Allowing the jury to hear all of plaintiff's evidence, only to be next told from defendant that "because of some circumstances," plaintiff refused to undergo an IME, would deprive the jury of hearing "both sides" of the argument, which in turn, would "diminish[] the whole integrity of the system." In light of the competing considerations, the judge did not compel plaintiff to submit to the procedures. However, the judge ruled "that if the plaintiff does not submit to the urodynamic testing requested by the defendants, the claim for damages relating to her complaints of bladder dysfunction and the urinary tract complaints will not be submitted to the jury." We granted leave to appeal.
On appeal, plaintiff asserts that the motion judge abused her discretion by barring plaintiff's claim if she refuses to submit to the examination; the pain and *981 discomfort that plaintiff will suffer from the examination outweighs the probative value of the examination to defendant; and a judge must balance the requested procedure against the risks posed to plaintiff. Defendant counters that the trial judge properly exercised her discretion in issuing the order, as she first explored the alternatives; plaintiff has already undergone the requested studies by her doctor but that the examination was "admittedly flawed and inaccurate"; the studies may reveal findings that refute plaintiff's claims and thus are critical to the defense; and defendant cannot obtain the sought-after information any other way.
We first set forth our standard of review as well as the relevant rule governing protective orders. A trial judge's "disposition of discovery matters, including the formulation of protective orders," normally is given deference by a reviewing court, absent an abuse of discretion. Payton v. New Jersey Tpk. Auth., 148 N.J. 524, 559, 691 A.2d 321 (1997). However, "deference is inappropriate if the court's determination in drafting its order is based on a mistaken understanding of the applicable law." Ibid. A judge abuses her discretion when she fails "to exercise discretion because the court did not realize it has such discretion." Alk Assocs. v. Multimodal Applied Systems, Inc., 276 N.J.Super. 310, 314-15, 647 A.2d 1359 (App.Div.1994).
The general rule regarding adverse medical examinations is found in R. 4:19. Under that rule, where a party asserts a claim for personal injuries or where the "physical condition of a party is in controversy, the adverse party may require the party whose physical ... condition is in controversy to submit to a physical ... examination by a medical or other expert." Upon receipt of such a request from an adversary, a party may move for a protective order pursuant to R. 4:10-3 (stating in part: "Upon motion by a party ... from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party ... from ... undue burden."). Thus, "the burden of seeking relief from the court is placed on the noncomplying party," Pressler, Current N.J. Court Rules, comment on R. 4:19 (2003), who must move for a protective order and show "good cause" to support the granting of such an order. See R. 4:10-3; Kerr v. Able Sanitary and Envtl. Servs., Inc., 295 N.J.Super. 147, 155, 684 A.2d 961 (App.Div.1996) (finding "[i]mplicit in R. 4:10-3[] the notion that the movant bears the burden of persuading the court that good cause exists for issuing the protective order").
One New Jersey court has addressed the issue in dispute. In Duprey v. Wager, 186 N.J.Super. 81, 451 A.2d 416 (Law Div. 1982),[5] the Law Division judge was confronted with a plaintiff who alleged "injury to her reproductive organs" and objected *982 to a hysterosalpingography, an invasive procedure that "necessitate[d] rupture of her hymen." Id. at 84-85, 89, 451 A.2d 416. Citing decisions of other jurisdictions, the judge evaluated the parties' competing interests by weighing the reasons for defendant's request against the reasonableness of plaintiff's refusal to submit to the examination. Duprey, supra, 186 N.J.Super. at 86-90, 451 A.2d 416.
In Duprey, the judge explained that to establish "good cause," the requesting party must show a need for the examination. Relevant factors include whether defendant is able to obtain the information by alternative means, whether plaintiff had previously undergone a similar examination, and whether an examination is "necessary to determine the extent, nature and permanency of alleged injuries." Id. at 86-87, 451 A.2d 416. Then, whether plaintiff's refusal to undergo the examination is reasonable depends on the potential risk the examination presents to plaintiff, and the harm plaintiff is likely to suffer therefrom. Id. at 87, 451 A.2d 416. Important considerations include safety, substantial "inconvenience and deleterious effect ... that [] reach beyond minor pain or discomfort," and "threat posed to [plaintiff's] health and well-being." Id. at 86, 88, 451 A.2d 416. "When the potential physical and mental consequences appear to outweigh the probable benefits to the interests of justice, the court will be constrained to deny the examination sought by defendant." Id. at 87, 451 A.2d 416.
In Duprey, after discussing these factors, the judge identified the following general guidelines:
1. The power to order a physical examination must be exercised with great restraint and with careful attention to the rights of the plaintiff.
2. The application must be supported by affidavit setting forth pertinent facts and reasons to justify the examination.
3. The physical examination should not be ordered where it appears that the information to be elicited would be merely cumulative.
4. Compelling considerations of justice on behalf of the defendant-applicant must be established.
5. The burden is upon the defendant-applicant to affirmatively establish that the requested physical examination can be conducted without considerable pain and danger to the plaintiff.
6. Adequate and appropriate precautions should be imposed so that privacy of the person is insured.
[Id. at 90, 451 A.2d 416 (citing Richardson v. Johnson, 60 Tenn.App. 129, 444 S.W.2d 708, 710 (1969))].
Applying these principles, the judge particularly noted that plaintiff had not previously "voluntarily submitted herself to an internal examination" and the effects of the procedure "would have far-reaching cultural dimensions in [her] ability to contract marriage." Id. at 89-90, 451 A.2d 416. Given the special harm plaintiff was likely to suffer and noting defendant's failure to show that such an order was "necessary to afford [him] justice," as an alternative procedure apparently existed, the judge found that the risks of the procedure outweighed "any benefits to justice to defendant" and denied defendant's motion. Id. at 85, 89-90, 451 A.2d 416.
In general, the factors enumerated in Duprey are consistent with those considered in other jurisdictions whose courts have conducted a similar fact-sensitive, risk-benefit analysis. This analysis balances the specific potential harm and risk to the objecting party against the need of the requesting party, as well as equity and *983 fairness concerns, to determine whether good cause exists for ordering a party to submit to an invasive or risky medical examination. See, e.g., McQuillen v. City of Sioux City, 306 N.W.2d 789, 789-91 (Iowa 1981) (finding the trial court properly exercised its discretion in ordering plaintiff to submit to a coronary arteriography, where the procedure would elicit information regarding plaintiff's alleged condition, risk of complications was placed "at less than one and one-half percent" and plaintiff failed to show "that the risk of serious complications reached that level or that plaintiff would have peculiar susceptibility to risk"); Cardinal v. Univ. of Rochester, 271 A.D. 1048, 69 N.Y.S.2d 352 (N.Y.App.Div.1947), aff'g 188 Misc. 823, 71 N.Y.S.2d 614 (N.Y.Sup.Ct.1946) (affirming the order compelling plaintiff to submit to an invasive procedure and expressly allowing defendant leave to seek an order to compel plaintiff to submit to a bone marrow biopsy by showing the necessity of the procedure, presenting detailed information about the procedure, how frequently it is performed, and any known risks and after-effects).
Decided after Duprey and suggesting a different analytical methodology, Lefkowitz v. Nassau County Med. Ctr., 94 A.D.2d 18, 462 N.Y.S.2d 903 (1983), utilized a burden-shifting approach in addition to the risk-benefit analysis. In Lefkowitz, defendants sought to compel plaintiff to submit to a hysterosalpingogram, the same procedure at issue in Duprey, involving an "X-ray examination of the uterus and fallopian tubes after injection of a radiated opaque medium." Id. at 18-19, 462 N.Y.S.2d 903. Where a party objects to a procedure because of its possible danger, the Lefkowitz court articulated the burden shifting between the parties. Id. at 21, 462 N.Y.S.2d 903. First, the plaintiff has "the burden of showing that the proposed test is prima facie potentially dangerous." Ibid. (citations omitted). If this burden is met, then "the burden shifts to the party seeking the test to demonstrate its safety." Ibid.
The necessary evidentiary showing, the court explained, includes "proof `showing the necessity for such examination, the details of the procedure employed in making it, the frequency with which it has been done, together with the experience and observations which have been made by physicians as to pain, harm, or after results of any nature, occurring to persons so examined.'" Ibid. (citing Cardinal, supra, 271 A.D. at 1048). As defendants offered only "conclusory statements of [their] counsel," the court found they failed to meet their burden of showing that the proposed test, the safety of which was still unsettled, would not be harmful. Ibid. Thus, Lefkowitz, which has been followed in New York and by other jurisdictions, requires a particular showing of harm or safety, supported by more than conclusory statements. See Langelier v. Ford, 159 A.D.2d 851, 852-53, 552 N.Y.S.2d 992 (N.Y.App.Div.1990) (finding that defendant met its burden, under Lefkowitz, of showing the safety of MRI and CAT scans, where plaintiff's expert conceded that any complications were "reversible with proper treatment" and "he had never had a patient suffer permanent injury from the procedure"); Thomas v. John T. Mather Mem'l Hosp., 162 A.D.2d 521, 522-23, 556 N.Y.S.2d 720 (1990) (upholding the order to compel plaintiff to submit to a CAT scan under sedation, where defendants' presentation established the safety of the procedure, which is "a conventionally accepted method of determining the nature and extent of the plaintiff's neurological damage," the relatively mild sedative was frequently used with "few `unfavorable' side-effects," plaintiff had been prescribed more potent medications, and plaintiff had previously undergone CAT scans while sedated, while *984 plaintiff submitted only "a conclusory affidavit from his neurologist" without detailing the harm plaintiff would suffer). See also Pena v. Troup, 163 F.R.D. 352, 353, 355 (D.Colo.1995) (adopting "the Lefkowitz burden-shifting approach to decide cases such as [the present] one," where defendants sought to compel plaintiff child to submit to an MRI "under sedation or general anesthesia"); Stasiak v. Illinois Valley Cmty. Hosp., 226 Ill.App.3d 1075, 169 Ill.Dec. 55, 590 N.E.2d 974, 978-79 (1992) (applying Lefkowitz and finding that the court abused its discretion when it ordered an MRI of infant plaintiff while under sedation as, unlike in Sarka, defendant failed to show that plaintiff's medical records are deficient, "that the MRI will provide additional necessary evidence," or "that the MRI results will resolve any major legal issue"); Sarka v. Rush Presbyterian-St. Luke's Med. Ctr., 207 Ill.App.3d 587, 152 Ill.Dec. 614, 566 N.E.2d 301, 304, 308 (1991) (adopting Lefkowitz's rationale and finding no abuse of discretion by the trial court when it "granted defendants' motion to compel [plaintiff child] to submit to a CT scan under sedation" after properly weighing the risks); St. Clair v. Hatch, 62 P.3d 382, 384, 386 (Ok.2002) (adopting the Lefkowitz burden-shifting approach, but finding that under Oklahoma law, the objecting party always has the burden of persuasion to prove "the risk to the party to be examined outweighs the benefit to be derived from the examination").
Plaintiff criticizes defendant's reliance on decisions that concerned sedation, rather than invasive procedures. However, courts have engaged in the same analysis with respect to both types of procedures, suggesting that the risk, rather than the invasiveness, is the critical issue. See generally Steven R. Gabel, IME's: Are Invasive Techniques and Sedation Permissible?, 75 Mich. B.J. 836 (1996) (discussing sedation and invasive procedures in the context of IMEs, finding that courts must conduct a fact-sensitive inquiry when faced with a request that involves either issue in the absence of specific governing law, and suggesting that Michigan follow the New York burden-shifting approach and risk-benefit analysis).
The interests critical to the analysis, then, are specific potential harm or risk to plaintiff in light of plaintiff's right to safety and health; defendant's need for the examination, i.e., whether the information is obtainable from other sources or is cumulative; and fairness concerns, i.e., whether the examination is required to place the parties on equal footing because the examination goes to a critical issue of the case.
Plaintiff claims that where the procedures are invasive and potentially harmful, such that the detriment to plaintiff "far outweighs the [examination's] limited probative value," the judge may not then condition plaintiff's ability to present her injury claims on her voluntary submission to that examination. Plaintiff further argues that the invasive procedures "would cause [plaintiff] great pain, discomfort and anxiety," that her pain would necessitate the procedures be done under general anesthesia, thereby subjecting her "to the risks inherent in the administration of general anesthesia," and that the procedures would additionally subject her "to the risk of urinary tract infection and/or bleeding."
Defendant counters that plaintiff has presented "no confirmed medical or physical reason why [she] cannot undergo the requested studies" and "relies upon her subjective complaints of pain and scare tactics relating to risks of anesthesia." Defendant moreover points to Dr. Saypol's opinion that the "two studies could be performed in [his] office with minimal discomfort *985 to the patient," as "Dr. Boorjian described no urethral abnormality at the time of his cystoscopic examination."
The risk and pain an invasive procedure potentially presents to the objecting party are foremost concerns, given plaintiff's right to health, safety and well-being. See Duprey, supra, 186 N.J.Super. at 90, 451 A.2d 416; Simms v. Montana Eighteenth Judicial Dist. Court, 315 Mont. 135, 68 P.3d 678, 682-84 (2003) (explaining that to determine whether good cause exists, the court must weigh defendant's request, including "[t]he time, place, manner, conditions and scope of [the] examination" and whether defendant can "obtain the information necessary to an informed defense" by other means, against the state constitutional rights to privacy, safety, health, and happiness). Indeed, extreme risk to plaintiff has been a sufficient ground for denying an order to compel submission to a physical examination. See Carrig v. Oakes, 259 A.D. 138, 138-39, 18 N.Y.S.2d 917 (N.Y.App.Div.), appeal denied, 259 A.D. 798, 18 N.Y.S.2d 918 (1940) (refusing to compel plaintiff to submit to a cystoscopic examination, described as "`a major operation[,] ... most painful ... [and] known to cause death,'" while noting that a court may now compel a party "to submit to the taking of X-ray pictures," when once they were deemed too harmful).
Dr. Boorjian's first attempt at passing the catheter to perform the cystoscopy and urodynamic studies was unsuccessful due to either "a mechanical obstruction of some sort ... [or] a contraction of the pelvic musculature secondary to anxiety." Plaintiff's certification states that she was in "severe pain" during this attempt, but that Dr. Boorjian subsequently explained to her "that there was no obstruction but that [she] was experiencing severe pain from post traumatic stress" from the caesarean section. Plaintiff further acknowledged that while "[t]he subject procedure may be a routine procedure for most patients seen by the defendant's expert, [it is] not for me."
However, during the subsequent, successful attempt at these procedures, Dr. Boorjian inserted the catheter twice with only local anesthesia and with only discomfort noted; the cystoscopy was conducted while plaintiff was under general anesthesia. One of the supplemental medical submissions also indicated that cystoscopy is "routine [] for the evaluation of both men and women with urinary incontinence" and that as we previously noted, "there does not appear to be any controversy about the need for cystoscopy in patients with persistent symptoms of urgency and frequency." Furthermore, "synchronous multichannel video-urodynamics [is believed to] offer the most comprehensive, artifact-free means of arriving at a precise diagnosis" and is conducted "routinely when urodynamics are indicated."
Based on this record, then, the trial judge could have concluded that plaintiff's pain is psychogenic and the procedures defendant seeks to perform on plaintiff are medically routine. Furthermore, plaintiff had previously undergone the procedures while under general anesthesia, and defendant points out that "plaintiff has undergone [six] procedures utilizing general anesthesia and has never had an anesthesia-related complication."
Plaintiff's interest, however, must then be balanced against defendant's interest in obtaining an independent medical examination to mount an adequate defense and defendant's need for the information. See, e.g., Taylor v. Morris, 62 S.W.3d 377, 378-80 (Ky.2001) (finding that "even the production of voluminous records by plaintiff does not necessarily negate the defendant's interest in an independent examination of plaintiff" and upholding an order *986 compelling plaintiff to submit to an invasive examination to maintain the parties' equal opportunity to assess plaintiff's physical condition); Thomas, supra, 162 A.D.2d at 522, 556 N.Y.S.2d 720 (recognizing "a need as well as a benefit to be derived from the [requested] CAT scan, since it may enhance the defendants' ability to prepare a defense"). In fact, while plaintiff relies on Carrig, supra, 259 A.D. 138, 18 N.Y.S.2d 917, which described a cystoscopy as "`a major operation ... known to cause death,'" another court in Klein v. Yellow Cab Co., 7 F.R.D. 169, 169-70 (N.D.Ohio 1944), granted defendant's motion to order plaintiff to submit to an examination that included a cystoscopy. As plaintiff alleged "serious injury to his pelvis, groin, genital organs, [] bladder, and [] permanent injury to the urethra, prostate gland, and sexual function," the court found that the examination was necessary for defendant to "meet the issue as to the nature and extent of the injuries," despite plaintiff's objection that the examination would be "too painful ... with [] the probability of serious or painful consequences." Ibid.
Defendant's need, therefore, must be adequately considered. Here, plaintiff argues that "[d]efendant has failed to show that the requested examination procedures are required in the interest of justice," as copies of Dr. Boorjian's reports and plaintiff's medical records, interrogatory answers and deposition have all been provided to defendant. Defendant counters that the studies conducted by Dr. Boorjian were inadequate, preventing Dr. Saypol, defendant's expert witness, from "reach[ing] a determination as to whether [p]laintiff's symptoms are related to the bladder injury and what the extent, nature and cause of the bladder condition are."
Where the examination would yield no results of probative value, defendant has little basis to compel plaintiff to undergo the examination. See Ex parte Wal-Mart Stores, Inc., 729 So.2d 294, 298 (Ala. 1999) (finding that defendants had not established actual need for the requested examination, as defendants' expert witness had already reviewed plaintiff's medical records, which he used to formulate his opinion as to the cause of plaintiff's physical discomfort, and it was not "established that the requested examination would provide any specific additional information that is not available from another source").
To show that defendant lacks sufficient interest in the procedures, plaintiff relies on the statement, "[u]nstable detrusor contractions are typically seen as a gradual increase in detrusor pressure without subsequent decrease, but no essential differences exist between gas and water cystometry in the classification of qualitative data." However, plaintiff alleges that defendant's negligence in incising her bladder has caused various urological problems, including "urinary frequency, incontinence, painful urination, and smaller bladder"; therefore, not only would qualitative data appear to be necessary, but also quantitative data, as to which plaintiff's medical submission states that when gas is used, "[a]n artefactual, initial pressure increase may be seen," and that "bladder capacity is often only 2/3 of the capacity measured with medium-fill water cystometry."
Defendant's medical submission also indicated the following disadvantages of using gas: "[r]apid filling [of gas] may [] lead to erroneous diagnosis of reduced bladder compliance. It is not suitable for studying voiding, and leaking is very difficult to detect due to invisibility of gas. Gas cystometry is not reliable [] and thus not recommended." Dr. Saypol indicated that the only abnormality shown in Dr. Boorjian's report is "reduced bladder capacity, *987 which can be easily explained by the use of CO2 and lacks the requisite detail necessary for a proper diagnosis." Apparently, then, the use of gas versus liquid can yield significantly different results. Furthermore, the judge specifically asked plaintiff's counsel whether another medical procedure is available to find out the same information, but received no answer. As defendant sought the examination to determine "the extent, nature and cause of the bladder condition" and could not obtain the information by alternative means, the trial judge could have concluded that defendant has a strong interest in independently examining plaintiff.
The judge saw the issue as a need to weigh plaintiff's resistance to the requested procedures due to the anticipated pain against defendant's need for the procedures. The judge noted that defendant's need for the information sought by conducting an IME must be sufficient to order plaintiff to submit to the exam. Indeed, the judge suspended ruling on the motion pending additional submissions by the parties regarding the accuracy of urodynamic studies when gas is used, versus when liquid is used, stating "if it's a minimal difference, then we'rewe're wasting our time." The judge also specifically averred that "[e]ven if [plaintiff's] discomfort is all in her head, it's something that I still have to deal with because it's in her head."
Ultimately, although the judge identified many of the issues, she failed to engage in the weighing process necessary to either authorize the procedurea conclusion that the balance weighed in defendant's favoror deny defendant's right to the procedurea conclusion that the balance weighed in plaintiff's favor. She also concluded, erroneously, that she could not compel the exam but entered an order barring the claim if plaintiff failed to submit.
A judge determining an application of this nature must engage in this weighing process and consider the factors that we have enunciatedthere must be an inquiry as to the risk and legitimacy of the proposed procedure and then whether the test would produce the results sought. And, of course, specific findings are imperative not only to insure proper review, but to inform the litigants, as well. If defendant fails to demonstrate the second prong, or "the need factor," plaintiff should not be compelled to comply no matter how high or low the risk. These issues must be resolved on remand.

II.
We next address the issue of the appropriate remedy. Any consideration of this issue requires us to recognize the polestar standard that orders must be crafted to accord with "the administration of justice." McGovern v. Hope, 63 N.J.L. 76, 84, 42 A. 830 (Sup.Ct.1899). If the judge determines that the test is not safe, will generate substantial discomfort or will not provide the relevant information, defendant has no remedy other than cross-examination of plaintiff's health care professionals as to the bona fides of the administered tests and results. Defendant cannot comment to the jury or make inquiry of its expert regarding plaintiff's failure or refusal to submit to the test since the judge has determined that plaintiff need not submit to such exam. Defendant can explore comparisons between the various test alternatives, including providing direct proof of the "better test."
Where the judge orders the invasive procedure, different considerations apply. Under the particular circumstances here, the judge, rather than ordering *988 plaintiff to submit to the objected-to invasive procedures, offered plaintiff the option of either "voluntarily" submitting to the examination, or giving up "her claim for damages relating to her bladder dysfunction and urinary tract complaints." This is a Hobson's Choice[6] not befitting the facts. "A trial court has inherent discretionary power to impose sanctions for failure to make discovery, subject only to the requirement that they be just and reasonable in the circumstances." Calabrese v. Trenton State Coll., 162 N.J.Super. 145, 151-52, 392 A.2d 600 (App.Div.1978) (citations omitted), aff'd, 82 N.J. 321, 413 A.2d 315 (1980). Judges previously have utilized their authority to craft orders appropriate to the facts before them. See, e.g., (Scott v. Scott, 190 N.J.Super. 189, 195-96, 462 A.2d 614 (Ch.Div.1983)) (limiting defendant's participation at trial in a matrimonial action to cross-examination, where defendant failed to "file a preliminary disclosure statement" and provided no discovery); Friedrichsen v. Niemotka, 71 N.J.Super. 398, 401, 403, 177 A.2d 58 (Law Div.1962) (granting defendant's motion to compel plaintiff's son, not a party to the action, to submit to a physical examination, as "plaintiff's cause of action depend[ed] upon the nature and extent of his child's injuries," requiring plaintiff to prove "the reasonable cost of such care and treatment as were necessitated by the injuries and only for such loss of services as resulted from the injuries," which in turn gave "defendant [] the right to prepare to meet that proof," and staying the proceedings "until and unless [plaintiff] permits such examination"). Under more extraordinary circumstances, we have approved as a sanction for a party's failure to provide discovery, the exclusion of such evidence at trial and even dismissal of the suit prior to trial. See, e.g., Kolczycki v. City of East Orange, 317 N.J.Super. 505, 512, 722 A.2d 603 (App.Div.1999) (upholding the trial judge's "suppression of defendants' answer and defenses, because of defendants' persistent dereliction in providing discovery," as a proper exercise of discretion). "[T]he overriding objective" is, nevertheless, to allow "the defaulting party his day in court." Clark v. Fog Contracting Co., 125 N.J.Super. 159, 161-62, 309 A.2d 617 (App. Div.), certif. denied, 64 N.J. 319, 315 A.2d 408 (1973) (finding the court's "exclusion of testimony on the ground of failure to supply information sought in discovery" a proper exercise of discretion, as "there was no reasonably available opportunity to permit plaintiff to remedy his default").
Here, the judge declined to order plaintiff to submit to the procedures. However, recognizing the prejudice that defendant would suffer if unable to independently examine plaintiff, the judge then conditioned plaintiff's ability to present the relevant claims on her voluntary submission to the requested procedures. Our concern is that if the procedure had met the balancing tests we have previously addressed, other options were available that did not involve exclusion of plaintiff's claima bar that for all intents and purposes eliminated a significant part of plaintiff's claim for damages. We now explore these options.
Other jurisdictions have recognized a court's discretion to issue similar discovery orders and impose sanctions against non-complying parties. By objecting, plaintiff "subjects [herself] to the possibility of sanctions that may just as effectively prevent [her] from prosecuting [her] case as that refusal hinders [her] opponent's *989 ability to defend." Larsen v. New, 47 Conn.Supp. 536, 812 A.2d 220, 222 (2002). Possible sanctions against plaintiff include "cross-examination, comment by counsel to the jury about that refusal, exclusion of expert testimony from the plaintiff, or other sanctions that the court may find reasonable and appropriate under the circumstances." Ibid. at 222. Dismissal of plaintiff's claim has been approved as a sanction. See McQuillen, supra, 306 N.W.2d at 791-92 (upholding the trial court's dismissal of plaintiff's petition as a proper exercise of discretion, as the trial court had found good cause for ordering plaintiff to submit to a coronary arteriography and plaintiff had willfully refused to submit to same, even though the court did not doubt "plaintiff's sincerity in not wishing to assume the risks of the test" and acknowledged that "less drastic alternatives were available").
Klein, supra, 7 F.R.D. 169, reflects the motion judge's view. Faced with plaintiff's objection to a cystoscopy on the ground that that it was "too painful" and could result in "serious or painful consequences," the court there instructed plaintiff to "submit all reports of examinations by his doctors, hospital records, and statements of what his doctors will testify to in respect of [his] alleged injuries, based upon cystoscopic examinations and other related procedure; or, if the plaintiff prefers, to stipulate that no medical evidence will be introduced by him, obtained through cystoscopic examination." Id. at 169-70. Thereafter, in its supplemental opinion, the court ordered plaintiff to submit to the examination, concluding that "[i]f the plaintiff shall refuse to submit to such examination, ... it would seem to the Court that the plaintiff is not entitled to the benefit of this jurisdiction for the trial of his case, and the action will thereupon be dismissed." Ibid.
Despite the motion judge's reticence to order submission to the invasive procedure and her concern that she did not have the authority to do so, we conclude that she did indeed have that authority. Only if plaintiff then refused should the issue of that refusal have been addressed. The judge rejected use of cross-examination as insufficient. We agree that where a procedure is ordered, cross-examination as the sole remedy available to defendant is insufficient. That remedy gives him nothing more than he already has. We agree that the alternative of barring Dr. Boorjian's testimony or his test may be an inappropriate remedy if the results are so integrated into the record as to effectively bar the claim or the basis on which her expert based his opinion.
We deem the last and least favorable option to be a bar of plaintiff's claim. Although a party places his or her physical condition in controversy upon beginning a medical malpractice lawsuit, "a person should not be required to place his [or her] health or life in danger as a condition to maintaining suit." Stasiak, supra, 169 Ill.Dec. 55, 590 N.E.2d at 979. Neither should a person who has chosen a course of treatment with his or her own treating physician, thereby leaving him or her open to certain risks, then be compelled to be exposed to the same level of risk for discovery purposes.
We add one additional observation and consideration for a trial judge who has determined that a plaintiff must submit to an invasive procedure as part of an IME. During the course of the process to determine the bona fides of the proposed invasive procedure, the proponent's expert witness who will presumably administer the procedure is no longer simply a physician but in some sense, has become plaintiff's adversary. If the expert-physician undertakes the invasive procedure, his or her *990 relationship with the patient may well be more than merely an examining expert-physician, an issue that we need not address or resolve here. Certainly, the elements of trust and confidence, critical concerns of a physician and patient when undergoing an invasive procedure, may be compromised in this scenario. To address these concerns, the trial judge may consider the appointment of a neutral physician to administer the procedure. This physician may be chosen by agreement of the parties or their experts or, as a matter of last resort, by the judge. The neutral physician would testify as a fact, not an expert, witness and the physician's test results would be available to the parties and their experts.
An appropriate balance of the competing interests would be served by adopting, in part, the rule enunciated by the Connecticut court in Larsen. That will include allowing testimony by defendant's experts as to the nature of the proposed procedure, the risks involved and the benefit to be served by the results of the test. Moreover, counsel should be given the opportunity to argue to the jury that, where ordered, plaintiff has refused to allow the procedure.[7]
We are concerned that the trial not devolve into a dispute overly focused on plaintiff's refusal to submit to the procedure. In sum, we do not want the "shield" of properly-sought and warranted invasive examinations to become a "sword" for barring legitimate claims. However, we also recognize that as to plaintiff's claim for damages here, plaintiff's refusal may well be an important consideration in the ultimate determination of the jury. Finally, we note that these cases are fact-sensitive and require careful analysis and weighing by the trial judge.
We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] This determination, as well as the balancing process that we describe may, in appropriate cases, require more than consideration of conflicting certifications. The judge then may at his or her discretion order a hearing to resolve these issues.
[2] Plaintiff Alexander Il Grande, Carolyn's husband sought per quod damages. All references to plaintiff shall refer to plaintiff Carolyn Il Grande.
[3] "Diaphoretic" is increased perspiration. Webster's Third New Int'l Dictionary 624 (1981).
[4] The "detrusor" is "the outer largely longitudinally arranged musculature of the bladder wall." Webster's Dictionary, supra, at 617.
[5] Duprey was decided before the latest revision of R. 4:19. The prior version of R. 4:19 permitted a judge to order a party, whose physical condition was in controversy in a claim for personal injuries, to submit to a physical examination "only on motion for good cause shown." R. 4:19 (1972), amended 2000; see Duprey, supra, 186 N.J.Super. at 85, 451 A.2d 416. Thus, the Law Division judge placed the burden on defendant to demonstrate that "the requested physical examination can be conducted without serious pain or danger to plaintiff," and that "an order [is] necessary to afford justice to defendant." Duprey, supra, 186 N.J.Super. at 85, 90, 451 A.2d 416. Notably, however, as a result of the 2000 amendment, R. 4:19 and R. 4:10-3 place the ultimate burden of persuasion on the objecting party to demonstrate good cause for granting a protective order. R. 4:10-3; R. 4:19; Pressler, Current N.J. Court Rules, comment on R. 4:19 (2003).
[6] A Hobson's Choice is "an apparently free choice that offers no actual alternative." Webster's II New College Dictionary 526 (1999). Its etymology is from Thomas Hobson (1544-1631), an English keeper of a livery stable, who would require that "customers take either the horse nearest the stable door or none." Ibid.
[7] We do not suggest that the jury be charged as to a negative inference. Cf. State v. Clawans, 38 N.J. 162, 183 A.2d 77 (1962); Wild v. Roman, 91 N.J.Super. 410, 220 A.2d 711 (App.Div.1966).