769 A.2d 1071 (2001)
338 N.J. Super. 425
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
T.J.B., Defendant-Appellant.
In the Matter of the Guardianship of A.M.B., a Minor.
New Jersey Division of Youth and Family Services, Plaintiff-Respondent,
v.
A.T.L., Defendant-Appellant.
In the Matter of the Guardianship of A.M.B., a Minor.
Superior Court of New Jersey, Appellate Division.
Submitted February 28, 2001.
Decided March 26, 2001.
*1072 Peter A. Garcia, Acting Public Defender, for appellant T.J.B., (William Welaj, Designated Counsel, of counsel and on the brief).
Peter A. Garcia, Acting Public Defender, for appellant A.T.L., (Patricia Nichols, Designated Counsel, of counsel and on the brief).
*1073 John J. Farmer, Jr., Attorney General, for respondent New Jersey Division of Youth and Family Services, (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lisa Rose, Deputy Attorney General, on the brief).
No brief was submitted by the Law Guardian for A.M.B., a minor.
Before Judges KEEFE, EICHEN and WEISSBARD.
The opinion of the court was delivered by EICHEN, J.A.D.
T.J.B., the biological mother of A.M.B., born August 6, 1998, and A.T.L., the putative biological father, appeal separately[1] from a March 23, 2000 order denying their motions to set aside a final judgment by default entered on December 14, 1999 terminating their parental rights to A.M.B. The judgment by default was stayed pending this appeal.
A.M.B. has been in placement at a DYFS facility known as Hudson Cradle since immediately after his birth.[2] A.M.B. was placed there voluntarily under a temporary Foster Home Placement Agreement entered into between T.J.B., A.T.L. and DYFS on August 12, 1998.
On May 6, 1999, DYFS commenced this guardianship action by filing a verified complaint and order to show cause seeking placement of A.M.B. under its care and supervision.[3]
On June 29, 1999, in the presence of defendants, Judge DePascale entered an order directing defendants "to file application for 5-A (Indigency)" and "the Office of the Public Defender to appoint." See N.J.S.A. 30:4C-15.4. The order also directed the appointment of a law guardian for A.M.B. The matter was then set down for a review on August 10, 1999 at 9:00 a.m. before Judge Lisboa. The order did not contain a provision for a DYFS case manager's name and telephone number.
The form of order utilized to memorialize the court's order is a form used by the court in a variety of family matters, including ordinary custody and visitation cases not involving DYFS. In a boilerplate provision, in small print, the order states: "If you fail to comply with the provisions contained in the Order pursuant to N.J.S.A. 2C:13-4 [concerning interference with custody] you may be subject to Criminal penalties to include but not to be limited to *1074 imprisonment, probation and/or fines." Therefore, nothing in the order alerted defendants to the possibility that their failure to appear at a review hearing could result in the entry of a default judgment terminating their parental rights.[4]
On August 10, 1999, the law guardian and the Deputy Attorney General representing DYFS, as well as A.T.L.'s assigned counsel, appeared in court. Neither T.J.B.'s counsel nor T.J.B. appeared. Over A.T.L.'s counsel's objection, Judge Lisboa entered a default against both defendants. The matter was again listed for review on September 21, 1999.
On September 21, 1999, both defendants appeared as did appointed counsel for A.T.L. and the law guardian. However, once again, no counsel was present for T.J.B., although the record suggests that T.J.B.'s counsel may have been present earlier in the proceedings. Judge Lisboa vacated the default and entered an order requiring A.T.L. to undergo paternity testing.[5] The order also directed both defendants to submit to drug and alcohol testing. It also states that "Psychological Evaluation Repts. [are] to be submitted to this court." The judge, however, did not admonish defendants that if they were absent again their parental rights might be terminated.
The record reflects that defendants attended the probation department that day and that drug and alcohol tests were performed.[6] The record also reflects that a psychological evaluation of A.T.L. had already been performed, but that the report had not yet been prepared. No mention of DYFS's efforts to obtain a psychological evaluation of T.J.B. appears in the record.[7] The matter was then listed for a review on November 16, 1999.
On November 16, 1999, neither T.J.B. nor A.T.L. appeared in court. T.J.B.'s attorney and the law guardian were present, however. As a result of defendants' non-appearance, Judge Lisboa again entered a default against them and rescinded the prior order requiring A.T.L. to undergo paternity testing.[8]
On December 14, 1999, both defendants appeared in court with their assigned counsel and the law guardian. Because Judge Lisboa was absent from court on that day, a third judge presided over the review. Defendants and the law guardian moved to vacate the default. A.T.L.'s attorney sought to explain A.T.L.'s non-appearance on November 16, 1999 based on an alleged asthma-related illness and his arthritis.[9] To this end, *1075 A.T.L. claimed he could get a doctor's note. T.J.B. acknowledged that she had been told orally in court of the November 16, 1999 court date, but claimed she had forgotten the date.[10] In addition, T.J.B. stated she did not receive mail notice of the court date, claiming that although she receives her mail at her foster mother's house, she lives elsewhere with A.T.L.
The judge rejected the excuses and denied the motions to vacate the defaults, concluding that defendants had been "irresponsible in their attendance at court." He then granted the Division's guardianship petition stating that he was basing his decision on "a Certification of Proof" furnished by DYFS. The certification was prepared by A.M.B.'s caseworker. It recited the two defaults, incorporated by reference the allegations of the verified complaint, and briefly indicated that if guardianship was granted, DYFS's plan was "selective adoption placement."[11] Despite A.T.L.'s counsel's plea that termination was a severe penalty for a non-appearance, the judge refused to reconsider his decision and entered a default judgment on December 14, 1999.
Defendants then filed motions for reconsideration, joined by the law guardian, challenging the procedures and substance of the judge's order, importuning that DYFS had not demonstrated that default would be "in the best interests of the child," and urging the judgment be set aside. On February 3, 2000, the judge entered an order, memorializing his decision, noting that "the child's best interests is adoption," and that the "[p]arents have not come up with a permanent plan." In making his findings, the judge apparently relied on the allegations in the verified complaint and the "Certification of Proof." The judge stated that T.J.B. is unable to parent A.M.B.; that A.M.B. had not had any significant contact with defendants since his birth; and that despite DYFS's efforts to work out a permanency plan with them, defendants had not been cooperative. The judge determined that defendants' lack of interest, as reflected by their failure to appear, justified granting guardianship to DYFS. He also stated that A.T.L. had failed to acknowledge paternity, and that although T.J.B. may be intellectually limited, she had assigned counsel to represent her interests. He further determined that the excuses defendants had offered for their non-appearance on November 16, 1999 were insufficient to overcome the strong need for "permanency and closure." He therefore concluded that "permanency and closure" justified the termination of defendants' parental rights to A.M.B. On March 23, 2000, the judge entered the judgment from which defendants and the law guardian now appeal.
On appeal, defendants argue that the judge erred (1) in refusing to vacate the default; (2) in refusing to set aside the default judgment; and (3) in entering a judgment terminating defendants' parental rights to A.M.B. in the absence of clear and convincing evidence that such termination was in the best interests of the child. Defendants also contend they received ineffective assistance of counsel.
What our Supreme Court reiterated some years ago in DYFS v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986), bears repeating here:

*1076 Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed `essential,' ... `basic civil rights of man,' ... and `[r]ights far more precious... than property rights'...." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972) (citations omitted). The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected. On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979) (citing Wisconsin v. Yoder, 406 U.S. 205, 230, 92 S.Ct. 1526, 1540, 32 L.Ed.2d 15, 33 (1972)).
The dilemma persists to this day and has become even more pronounced because of the recent emphasis on meeting the permanency needs of children like A.M.B. See In re Guardianship of K.H.O., 161 N.J. 337, 358-60, 736 A.2d 1246 (1999). Nonetheless, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." A.W., supra, 103 N.J. at 612, 512 A.2d 438 (quoting Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 606 (1982) (footnote omitted)).
Against this legal backdrop, and after carefully considering the facts and circumstances of the case, we conclude that the judge abused his discretion in refusing to set aside the default entered on November 16, 1999 under R. 4:43-3; in entering default judgment based on this record; and in refusing to vacate the judgment.
Initially, we note that the form of order utilized by the court was inadequate to advise defendants that if they failed to appear on any review date, a default judgment could be entered against them terminating their parental rights. It is significant that these were not trial dates or compliance review dates. They were in the nature of case management conferences for the attorneys.[12]
Certainly, there is no evidence that defendants failed to comply with any of the court's orders. Indeed, the record reflects the contrary is true. When ordered to file a 5-A application, they complied; when ordered to undergo alcohol and drug testing, they complied; when A.T.L. was ordered to undergo paternity testing, he tried to comply but because the September 21, 1999 order had been rescinded, the testing was canceled.
In most respects, the case was relatively new. Although it was commenced in May 1999, the law guardian did not appear until August 10, 1999 and both defense counsel did not enter their appearances until later. Further, DYFS had not furnished any discovery to defendants or the law guardian and no expert reports had been prepared. In these circumstances, it was an abuse of discretion for the judge to have entered a default judgment.
The abuse of discretion continued when the judge refused to vacate the judgment. It is axiomatic that an application to vacate a default judgment is "viewed with great liberality, and every reasonable *1077 ground for indulgence is tolerated to the end that a just result is reached." Marder v. Realty Constr. Co., 84 N.J.Super. 313, 319, 202 A.2d 175 (App.Div.), aff'd 43 N.J. 508, 205 A.2d 744 (1964). Recognition of this principle is particularly important when the results have consequences of magnitude such as the termination of a parent's rights to his or her child.
Both A.T.L. and T.J.B. claimed they had valid excuses. Whether or not these excuses were legitimate, given the absence of a pattern of non-compliance by defendants with the court's specific orders, the judge should have set aside the default judgment and allowed the case to proceed in the ordinary course.
The record indicates that both T.J.B. and A.T.L. may be seriously impaired. Although they are capable of participating in these proceedings through counsel, such individuals may need more prompting than those who are less intellectually challenged. That being so, DYFS has an obligation to do more than is reflected by this record to assure that such individuals understand the importance of their attendance in court.
We are satisfied that fundamental fairness requires reversal of the default judgment. We make no observations concerning the merits of DYFS's case. We simply hold that proper procedures must be followed, including the use of a more appropriate form of order, before we will affirm a termination order entered by default.
Moreover, we are convinced that entry of judgment based on a verified complaint should rarely occur in a termination case. Only through an evidentiary hearing can the court and the parties be assured that DYFS has met its heavy burden to prove by clear and convincing evidence that termination of a parent's rights to his or her child is in the child's best interests. In most default cases, the matter should proceed to a plenary hearing where defendants' counsel and the law guardian shall have an opportunity to cross-examine DYFS's witnesses. Even in the Special Civil Part, defendants are accorded such rights. The Family Part should provide no less protection; indeed, more is required.
In light of our decision that a reversal is mandated, we need not address defendants' claims of ineffective assistance of counsel. We add only that enhanced communication by counsel with their clients would go a long way to prevent the problems that arose in this case.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] The appeals were scheduled for disposition on the same appellate calendar. Although the appeals were not consolidated, we have elected to consider T.J.B.'s and A.T.L.'s contentions in a single opinion.
[2] DYFS's brief indicates, however, that A.M.B. was transferred to a private foster care home on February 16, 2000.
[3] The verified complaint describes a history of involvement by DYFS with T.J.B. dating back to August 13, 1994 when D.B., another child of T.J.B., was born and immediately placed under the care and supervision of DYFS. T.J.B.'s rights to D.B. were not immediately terminated inasmuch as T.J.B.'s foster mother had physical custody of D.B. When the foster mother died on February 3, 2000, DYFS obtained an order of guardianship of D.B. apparently based on T.J.B.'s acknowledgment that she could not care for him.

The complaint in this action alleges that both A.T.L. and T.J.B. are alcohol and/or substance abusers who live marginal existences, intermittently homeless and transient. T.J.B. is alleged to be intellectually limited (retarded) and both T.J.B. and A.T.L. are alleged to have serious psychiatric problems. The complaint further alleges that since A.M.B.'s birth, T.J.B. has had virtually no contact with him, although A.T.L.'s visits have been more frequent. The complaint further describes the efforts of DYFS to assist the family toward reunification or to find alternative family members who might possibly take A.M.B.
[4] All the orders entered in this case contained the same boilerplate provision. However, there is some evidence in the record that DYFS or the court may have mailed "subpoenas" to T.J.B. and A.T.L., which did contain such a provision. Nonetheless, the record is totally inadequate to enable us to conclude that they were either sent to the correct address or were received by defendants.
[5] The record reflects that paternity testing was scheduled for November 19, 1999 and that the caseworker was to pick up A.T.L. and take him to the place for testing.
[6] T.J.B.'s test results were negative; the record is silent as to the results of A.T.L.'s alcohol and drug tests.
[7] However, the record does contain two psychological evaluations of T.J.B. done in 1996 and 1997.
[8] In light of his non-appearance on November 16,1999, A.T.L. was unaware that the order compelling paternity testing had been canceled. Nonetheless, it appears that A.T.L. was prepared to have the testing done, but the caseworker did not appear on November 19, 1999 to escort him because the order requiring the testing had been rescinded.
[9] A.T.L. was age fifty-eight at the time of the proceedings.
[10] The 1996 psychological evaluation of T.J.B. reflects that she may be mentally retarded and suffering from short-term memory loss.
[11] There is no further indication in the record as to the meaning of "selective adoption placement."
[12] By so observing, we do not suggest that defendants need not appear. Indeed, they should appear provided, however, they are given proper notice of their obligation and the consequences of their non-compliance.