47 A.3d 764

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. M.G., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF A.R.G., A MINOR.

Superior Court of New Jersey
Appellate Division

Submitted May 30, 2012—Decided July 23, 2012.

Before Judges MESSANO, ESPINOSA and KENNEDY.

*Joseph E. Krakora,* Public Defender, attorney for appellant (*William J. Sweeney,* Designated Counsel, on the brief).

*Jeffrey S. Chiesa,* Attorney General, attorney for respondent (*Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Stephanie Anatale,* Deputy Attorney General, on the brief).

*Joseph E. Krakora*, Public Defender, Law Guardian, attorney for minor A.R.G. (*David Valentin*, Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

M.G., the defendant in this appeal from a termination of parental rights, regularly appeared at scheduled hearings in the Title 9 and Title 30 proceedings against him, even when incarcerated, and was represented by counsel throughout. This case presents the question whether it was proper to enter default against him based upon his sporadic failures to comply with orders that required him to submit to evaluations and obtain services. We conclude that it was not. For the reasons that follow, we further find that the flaws in the procedures here resulted in a failure to provide M.G. with the "fundamentally fair procedures" required before his parental rights could be terminated. *See N.J. Div. of Youth & Family Servs. v. T.J.B.*, 338 *N.J.Super.* 425, 433, 769 *A.*2d 1071 (App.Div.2001). We therefore reverse the termination order and remand for a new trial.

A.R.G. is the daughter of M.G. and his wife, F.C.-G.[1] When A.R.G. was born on December 24, 2009, she tested positive for marijuana. On December 28, 2009, the Division of Youth and Family Services (DYFS or the Division) executed an emergency removal of A.R.G. pursuant to *N.J.S.A.* 9:6–8.29 and 9:6–8.30. At that time, and at M.G.'s request, DYFS agreed to evaluate his aunt, L.P., as a placement option.

On December 30, 2009, DYFS filed a verified complaint alleging child abuse and neglect against both F.C.-G. and M.G. pursuant to *N.J.S.A.* 9:6–8.21 to –8.73, and asking the court to grant the

---

[1] A default was also entered against F.C.-G. and her parental rights were also terminated. She appealed and her case has been remanded to the trial court. Because she is not a party to this appeal, the facts regarding her are limited to those relevant to M.G.'s appeal.

Division continuing care and custody of A.R.G.; to find that she was abused or neglected; and to grant other relief as provided by *N.J.S.A.* 30:4C–12 and *Rule* 5:12–1 to –7.

From the time the initial Title 9 complaint was filed until his parental rights were terminated, M.G. regularly attended the scheduled hearings and was represented at each by counsel. His history of compliance with court-ordered evaluations and services can, however, be fairly characterized as checkered, and is summarized here to provide context.[2]

M.G. was referred to a substance abuse evaluation on February 1, and completed that assessment on March 16, 2010.

■ On March 24, 2010, the court concluded that the Division had failed to prove abuse or neglect by M.G. or F.C.-G. Nonetheless, the court ordered that the matter proceed under Title 30 and scheduled a hearing for April 14, 2010. The court also ordered both parents "to comply with the substance abuse evaluations and psychological evaluations as set by the Division."[3]

Approximately one week later, on April 1, 2010, M.G. underwent a psychological evaluation by Alan S. Gordon, Ed.D.

As of April 14, DYFS had not provided M.G. with either the report of his substance abuse evaluation or psychological evalua-

---

[2] We do not summarize M.G.'s attendance at supervised visitation except to note that at the proof hearing, the DYFS witness testified that there were a "very minimal" number of missed visits with A.R.G. when M.G. was not incarcerated.

[3] A trial court has "no authority to enter further orders in a Title 9 proceeding if it finds that the child has not been abused or neglected" unless the court determines, after a hearing, that the child is in need of services to ensure its health and safety. *N.J. Div. of Youth & Family Servs. v. T.S.*, 426 N.J.Super. 54, 64, 42 A.3d 942 (App.Div.2012). The disposition order of March 24, 2010, which required M.G. to submit to these evaluations and services, contains form language regarding the court's review of certain documents "and testimony given if any" and states, "the Court having determined that the best interest of the child(ren) requires the entry of the within Order[.]" No transcript of that hearing has been provided. Therefore, the record fails to inform whether the court conducted a hearing to determine that A.R.G. was in need of services.

tion. Nonetheless, the court ordered him to submit to weekly urine testing at DYFS's request and also required him to receive substance abuse treatment, marital counseling and parenting skills training. M.G. was ordered to submit to a urine screen "immediately" following the court hearing. Although DYFS contended M.G. did not appear for this screen, his attorney later reported that the results were negative.

Following the specific obligations imposed upon the defendants, a paragraph in the April 14 order included this language:

> Failure to appear at a court hearing, unless excused by the Court, or failure to comply with the provisions of this order *may result in entry of a default, termination of parental rights,*[4] or such other relief and proceedings as the Court deems just.
>
> [Emphasis added.]

On May 4, 2010, the Division filed an amended verified complaint, seeking a finding of abuse or neglect. The order dated May 5, 2010[5] repeats the court's earlier determination that the Division had not sustained its burden of proof under Title 9 and that the matter should proceed under Title 30. The order entered default against M.G. "for non-compliance with the Court ordered drug screen and services as set by the Division." The court also ordered M.G. to produce proof of the following: his attendance at a substance abuse program and mental health counseling; his official class schedule; financial support for the child; home utility bills in his name; lease or mortgage in his name; and documentation of benefits.

On May 13, 2010, M.G. completed an initial intake at the Family Growth Program of Catholic Charities (Family Growth Program) for anger management and domestic violence counseling. He participated in three additional counseling sessions thereafter, the last of which was cut short by the counselor when M.G. stated he

---

[4] Despite the threat of termination, there was no guardianship complaint pending at this time.

[5] A transcript of this hearing has not been provided.

was only attending counseling to regain custody of his daughter and had no other issues to discuss.

Dr. Gordon's report of his psychological evaluation of M.G., dated April 23, 2010, made suggestions regarding services M.G. should receive but did not state further psychological evaluation was required. Nonetheless, an order dated May 17, 2010 directed M.G. to participate in a psychological evaluation.[6] In addition, the order required M.G. to submit to a substance abuse evaluation and weekly urine screenings, and also to attend counseling. On May 18, services provided to M.G. by the Preferred Children's Services Child Protection Substance Abuse Initiative were terminated as a result of his non-compliance.

On May 25, 2010, the parties were again ordered to provide a copy of their lease at the next hearing scheduled for June 1. As reflected in the May 25 order, M.G. provided evidence of job searches and school grades. M.G. was also ordered to engage in a substance abuse treatment program and to provide proof of ten job searches. He failed to enroll in a substance abuse program by the June 1 hearing, and was ordered to do so again. The court also found his proof of job searches on June 1 to be deficient and ordered that he provide proof of thirty job searches by the hearing date one week later.

On June 8, 2010, M.G. still had not engaged in a substance abuse program as ordered but he did produce proof of seventy job searches for the court. The order of that date reflects the court's consideration of a lease document, job searches and M.G.'s school schedule. The court again ordered that he participate in a substance abuse program and directed the Division to submit another referral for such treatment. On July 2, 2010, M.G. completed his court-ordered substance abuse intake and also submitted to a drug screen, which was negative.

---

[6] Because a transcript of the May 17 proceeding was not provided, there is no record of the reason this evaluation was required.

On July 4, 2010, M.G. was arrested on a charge of simple assault and contempt of a domestic violence restraining order. He remained incarcerated until November 5, 2010.

Although in custody, M.G. appeared at the next hearing on July 27, 2010. Without any consideration as to what services were available to M.G. while incarcerated, the court ordered him to submit to another psychological evaluation, a substance abuse re-evaluation, weekly urine screenings and parenting skills training. M.G. was also ordered "to contact the Division for services upon his release from jail." The matter was scheduled for a compliance review on October 26, 2010.

Defendant was still incarcerated at the October 26 review hearing. Yet, he appeared and the court again ordered weekly urine screening, counseling and parenting skills training, and that he contact the Division for services upon his release. The order stated, "Default is entered against [M.G.] for non-compliance with services." At the hearing, the court provided its reasoning:

[A]t this point, Mr. [G. is] not following through on the services that were ordered for him because he's incarcerated. I find that that was a voluntary act on his part and that he's in default.

The court advised the parties they could file a formal motion to vacate the defaults, but stated that such motion had to be supported by a showing of a meritorious defense. The court stated further that the next hearing would be a permanency hearing and requested the Division to file an order to show cause or complaint if it intended to propose a termination of parental rights so that the permanency hearing scheduled for December 21, 2010, could serve as a return date.

The Division filed a guardianship complaint on December 10, 2010, seeking the termination of parental rights of both F.C.-G. and M.G., and asked the court to approve a plan of termination followed by adoption at the permanency hearing. M.G. was served with the guardianship complaint at the December 21 hearing and instructed to complete a new form to apply for the services of the Public Defender.

Without taking any testimony or evidence, the court announced at the December 21 hearing that the Division's plan was "reasonable[,]" that the case appeared "to be worse off" than when it started; that reunification of the child with the parents "is not possible[;]" and that the Division made "a great effort—to try to reunify [A.R.G.] with her parents[.]" The court also stated it was "well settled in the law" that the default entered against M.G. in the abuse and neglect proceeding continued into the guardianship proceeding. The court advised the parties again that they could move to vacate the default.

The net effect of this ruling was that at the very inception of the guardianship complaint—before he had an opportunity to plead, defend or comply with any court orders issued in that proceeding, M.G. was stripped of his right to present evidence, including any expert evaluations, in opposition to the Division's proofs.

The court scheduled a case management conference for January 25, 2011, and a proof hearing for February 18, 2011.

At the case management conference, the deputy attorney general advised that DYFS had scheduled psychological and bonding evaluations for M.G. on February 9, 2011, and a substance abuse evaluation for him on February 10, 2011, as well as evaluations for F.C.-G. and the foster parents.

The parties disagreed as to whether M.G. had to complete an anger management program at Family Growth Program before he could participate in individual and group counseling at that program. M.G.'s attorney objected to this requirement because M.G. had completed an anger management program while incarcerated and presented a certificate of completion to the court.

M.G. testified that the program he participated in entailed approximately one to one-and-one-half hours once or twice a week and taught him "how to control [himself], [his] anger, and walk away from situations. Be a better person." The deputy attorney general could provide no objective criteria for why the completion of the program in jail was insufficient to comply with any prior

court order. Instead, she relied upon the Family Growth Program representative's pronouncement that "they decline to accept any certificate from a county jail" and asked "that their anger management program be completed by [M.G.] as a prerequisite to his entering their individual and group therapy." [7] When the deputy attorney general was asked by the court, "What's Family Growth Program about," she answered that she had no information available. Despite the lack of any evidence to compare the two programs, the court found the Division's request "reasonable[,]" and ordered M.G. to "abide by the referral to Family Growth for anger management, and then the follow-up individual and group therapy."

The court also noted deficiencies in M.G.'s compliance, i.e., that the letter confirming his employment was not "verifiable" and should have been produced within thirty days of the prior hearing and that he had not provided an address for where he was living. The court made a general reference to the fact that M.G. "was found to be a parent in need of services and he hasn't complied with those services." The court then stated, "For all of those reasons, I find that Mr. [G.], if he wasn't in default already, he'd be in default today."

At the March 4, 2011 case management conference, the deputy attorney general reported that M.G. participated in the psychological and bonding evaluations as scheduled. He also attended the substance abuse evaluation interview and agreed to undergo a urine screen but failed to appear for that.

After two adjournments caused by the Division's failures to file its affidavit of proof as required by the court, the proof hearing was conducted on April 1, 2011. The Division stated its intention to produce one witness and rely upon its affidavit of proof and attachments, which included the expert reports regarding the psychological and bonding evaluations. At the outset, M.G.'s

---

[7] As previously noted, M.G.'s participation in the Family Growth Program was terminated by the Program in May 2010.

attorney objected to the proof hearing proceeding forward, noting the lack of an opportunity "to cross[-]examine the witnesses that are presenting in the form of reports, the psychological and bonding and foster bonding evaluations." Citing the time requirements for the filing of a guardianship application and final hearing set forth in *N.J.S.A.* 30:4C–15(d) and 30:4C–15.2, the court overruled the objection and stated the case was "appropriate to proceed today."

The only witness called by the Division was Erin Kelly, a Family Service Specialist II employed by DYFS. She provided the following testimony as a prelude to her testimony regarding the contents of the DYFS file:

Q. . . . Are you the keeper of the file in this matter?

A. Yes.

Q. And as the keeper of the file have you familiarized yourself with the entire record?

A. Yes.

 . . . .

Q. And is Dr. Gordon a consultant to the Division of Youth and Family Services?

A. Yes.

Q. And are these service providers listed within the affidavit of proof service providers used by the Division of Youth and Family Services?

A. Yes.

Q. And does the Division of Youth and Family Services also consult with those service providers in order to determine what services are best for a family?

A. Yes.

Q. And did the service providers set forth in the affidavit of proof do that in this case as to [F.C.-G.] and [M.G.]?

A. Yes.

Q. And did they do so in regard to [A.R.G.]?

 . . . .

A. Not the service providers, but Dr. Gordon, yes.

The reports of Dr. Gordon and Jamie Gordon–Karp, Psy.D., regarding their psychological evaluations and Dr. Gordon–Karp's bonding evaluation were included in the attachments to the affidavit of proof that was received in evidence.

Kelly testified that A.R.G. does not have any special needs, that she is "a very healthy little girl and she's developmentally on target." She is placed with two foster parents who desire to adopt her. Kelly also testified that the Division consulted with Dr. Gordon–Karp, who recommended that A.R.G. be adopted by her foster parents. Although M.G. presented the name of his sister, K.N.G., to DYFS for possible placement of A.R.G. at least as early as the date he was served with the guardianship complaint, Kelly admitted that the Division had not performed any evaluation of her prior to ruling her out. She testified that, because the child had been in foster placement for one year, she and her supervisor decided it would be against her best interests to delay the proceeding any further.[8] The balance of the Division's proofs were the affidavit of proof and attachments.

Counsel for M.G. was permitted to cross-examine Kelly. At the close of the hearing, he renewed his objection to the admission of the evaluations from Dr. Gordon–Karp and Dr. Gordon into evidence without him having the opportunity to cross-examine them. The court overruled the objections, issued a written statement of reasons for its decision that the Division had provided clear and convincing evidence to satisfy the four prongs of *N.J.S.A.* 30:4C-15.1, and entered an order terminating M.G.'s parental rights.

In its decision, the court did not provide any legal analysis for the entry of default against the parties. The court stated that the parties were in default "for sustained failure to comply with

---

[8] Although we express no opinion on the ultimate merits of this matter, we note that *N.J.S.A.* 30:4C–12.1 "simply does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least exploring available relative placements." *N.J. Div. of Youth & Family Servs. v. K.L.W.*, 419 *N.J.Super.* 568, 580, 18 *A.3d* 193 (App.Div.2011). The "plain meaning and purpose" of *N.J.S.A.* 30:4C–12.1 "is prompt identification of relatives and notice to them of the results of [DYFS'] investigation and the potential for termination if the child remains in foster care." *Ibid.* Where DYFS fails to comply with *N.J.S.A.* 30:4C–12.1, "the judicial determinations that follow are made without information relevant to the best interests of the child." *Id.* at 581, 18 *A.3d* 193.

services." The only failure of M.G. identified, however, was that he continued to be homeless as of each of the hearing dates on January 25, March 4 and March 25, 2011. The court stated as to each of these dates, "If the parents had not been in default at that time, the court would have held them in default on that date." Although the Division had repeatedly failed to file its affidavit of proof as required, no sanctions were imposed for its failure to comply with court orders. Instead, the court viewed these delays as giving the parties opportunities to show their compliance with orders and "file motions to vacate the default where they would be entitled to provide evidence of a meritorious defense[.]"

In his appeal from the order terminating his parental rights, M.G. argues that the "summary proceedings" violated his constitutional rights and that the elements of *N.J.S.A.* 30:4C–15.1 were not proven by clear and convincing evidence. Because we agree that the procedure here was fatally flawed, requiring a new trial, we do not address the ultimate merits of this matter.

I

As a preliminary matter, we note that M.G. did not object to the court's declaration of default in the Title 9 proceeding or to the court's declaration that this default would apply in the Title 30 proceeding. Further, he never filed a motion to vacate default.

 "The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." *State v. Robinson*, 200 *N.J.* 1, 19, 974 *A.*2d 1057 (2009). Because our consideration of the issues raised on appeal requires review of matters not objected to at trial, our review is governed by *Rule* 2:10–2, which states,

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

 A parent's right to enjoy a relationship with his or her child is constitutionally protected. *In re Adoption of Children by*

*L.A.S.*, 134 *N.J.* 127, 132, 631 *A.2d* 928 (1993); *Stanley v. Illinois*, 405 *U.S.* 645, 651 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972). Therefore, the State "must provide the parents with fundamentally fair procedures" before a parent's rights are terminated. *T.J.B., supra,* 338 *N.J.Super.* at 433, 769 *A.*2d 1071 (quoting *N.J. Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 612, 512 *A.*2d 438 (1986)).

The procedural deficiencies here denied M.G. the right to present a defense or to effectively test the proofs against him through cross-examination of the experts whose opinions were essential components of the State's evidence. The interests of justice therefore compel our review of the issues in this appeal.

## II

We first consider the trial court's entry of default against M.G. The trial court relied upon M.G.'s failure to comply with a court order and cited our decision in *N.J. Div. of Youth & Family Servs. v. P.W.R.*, 410 *N.J.Super.* 501, 983 *A.*2d 598 (App.Div.2009), *rev'd on other grounds,* 205 *N.J.* 17, 11 *A.*3d 844 (2011), as authority for the proposition that default was properly entered. However, neither *Rule* 4:43–1, which governs the entry of default,[9] nor our decision provide authority for the entry of default here.

*Rule* 4:43–1 states in pertinent part:

> If a party against whom a judgment for affirmative relief is sought *has failed to plead or otherwise defend as provided by these rules or court order,* or if the answer has been stricken with prejudice, the clerk shall enter a default on the docket as to such party.

[Emphasis added.]

The basis for the entry of default under this rule is the litigant's failure to participate in the litigation-by failing "to plead or otherwise defend[.]" Failures to file responsive pleadings or to appear when required to litigate the matter are straightforward

---

[9] Civil family actions are "governed by the rules in Part IV insofar as applicable and except as otherwise provided by the rules in Part V." *R.* 5:1–1.

examples of when default is properly entered. The more difficult issue is whether the failure to comply with a court order may warrant the entry of default.

The plain meaning of the rule's language does not authorize the entry of default merely upon a failure to comply with *any* court order. A nexus between the violation of rules and orders and an underlying failure to comply with the responsibilities of a litigant is central to the entry of a default based upon the failure to comply with an order. This is reflected in the threshold showing required to support a motion to vacate default judgment, that "the failure to answer or otherwise appear and defend was excusable under the circumstances[.]" Pressler and Verniero, *Current N.J. Court Rules,* comment 4.1 on *R.* 4:50-1 (2012). Thus, the rule's reference to a failure to "defend as provided by these rules or court order" is fairly read to authorize default only when the rule or order in question concerns the party's obligation to defend.

Our decision in *P.W.R.* does not support a contrary view. In that case, we reviewed the entry of a default against a defendant who did not attend the factfinding hearing in an abuse and neglect case under Title 9. *P.W.R., supra,* 410 *N.J.Super.* at 503, 983 *A.2d* 598. However, her attorney was present and represented her in the hearing. *Ibid.* We observed,

> Because a party represented by counsel may defend at trial without being physically present, default may not be entered when a party is not present at a trial absent evidence that the party has not otherwise defended as required by rule or court order.
>
> *Id.* at 506, 983 *A.2d* 598.

In considering whether default could be permitted based upon a failure to comply with an order, we explained that an entry of default could be permitted when a party fails "to adequately fulfill conditions imposed by a court order *in discovery or in preparation for trial*[.]" *Ibid.* (emphasis added). Therefore, we did not stray from the principle that a default based upon a litigant's failure to comply with an order must be rooted in a "failure to defend." We concluded that, because the order in question did

not mandate defendant's presence at the factfinding hearing and her attorney was there to defend her, the entry of default was improper.[10]

The conditions in orders that M.G. allegedly failed to adequately fulfill were not "imposed by a court order in discovery or in preparation for trial" but rather, were conditions imposed for the purpose of providing services in the best interests of A.R.G. In the end, the sole act of non-compliance the court cited as justification for the entry of default was M.G.'s continued homelessness. This fact may have relevance to the determination whether his parental rights should be terminated in the guardianship action. But he was represented by counsel throughout and, as noted, his homelessness did not stop him from regularly attending scheduled hearings. In short, his homelessness did not result in a failure to defend. Therefore, neither *Rule* 4:43–1 nor *P.W.R.* support the conclusion that M.G.'s failure to comply with the conditions of the orders cited provided a basis for entering default and depriving him of the right to a trial on whether his fundamental right to parent should be terminated.

We conclude our consideration of this issue by noting that trial courts have the means available under other rules to respond to a litigant's willfully contumacious failure to comply with an order, *Rules* 1:1–1 and –2, and to impose sanctions for the failure to comply with an order for discovery, *Rule* 4:23–2. Although courts have discretion "to craft orders appropriate to the facts before them[,]" the sanctions imposed for such non-compliance must be "just and reasonable in the circumstances." *Il Grande v. DiBene-*

---

[10] In addition to *P.W.R.*, the Division cites *In re Guardianship of N.J.*, 340 *N.J.Super.* 558, 775 *A.2d* 32 (App.Div.2001), as support for the proposition that an entry of default may be based upon a failure to comply with an order. However, *N.J.* is plainly distinguishable. Although the defendant failed to comply with various court-ordered drug evaluations, default was entered because she failed to appear for trial despite the fact that she was advised of the trial date and given a summons at her last court appearance. *Id.* at 560, 775 *A.2d* 32.

*detto,* 366 *N.J.Super.* 597, 621, 841 *A.*2d 974 (App.Div.2004) (internal citations and quotation marks omitted). The Supreme Court has instructed that the assessment of the appropriate sanction for the violation of an order requires consideration of "a number of factors, including whether the plaintiff acted willfully and whether the defendant suffered harm, and if so, to what degree." *Gonzalez v. Safe & Sound Sec. Corp.,* 185 *N.J.* 100, 115, 881 *A.*2d 719 (2005); *see also Abtrax Pharm., Inc. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 514, 655 *A.*2d 1368 (1995). The "overriding objective" remains to allow "the defaulting party his day in court." *Il Grande, supra,* 366 *N.J.Super.* at 622, 841 *A.*2d 974 (quoting *Clark v. Fog Contracting Co.,* 125 *N.J.Super.* 159, 161–62, 309 *A.*2d 617 (App.Div.), *certif. denied,* 64 *N.J.* 319, 315 *A.*2d 408 (1973)).

### III

The prejudice to defendant from the erroneous entry of default was exacerbated by the trial court's error in advising defendant he had to meet the standard applicable to a motion to vacate default judgment in order to vacate default.

A motion to set aside a default judgment will not be granted unless the movant shows the failure to appear or defend was excusable and that there is a meritorious defense. *Marder v. Realty Constr. Co.,* 84 *N.J.Super.* 313, 318, 202 *A.*2d 175 (App. Div.), *aff'd,* 43 *N.J.* 508, 205 *A.*2d 744 (1964); *see R.* 4:50–1. Still, "the opening of default judgments should be viewed with great liberality, and every reasonable ground for indulgence is tolerated to the end that a just result is reached." *Marder, supra,* 84 *N.J.Super.* at 319, 202 *A.*2d 175.

However, the standard applicable to a motion to vacate default is set forth in *Rule* 4:43–3. Contrary to the court's repeated statement to the parties, only a "mere showing of good cause is required for setting aside an entry of default." *N.J. Mfrs. Ins. Co. v. Prestige Health Grp., LLC,* 406 *N.J.Super.* 354, 360, 967 *A.*2d 911 (App.Div.), *certif. denied,* 199 *N.J.* 543, 973 *A.*2d 946 (2009). In *O'Connor v. Altus,* 67 *N.J.* 106, 128–29, 335 *A.*2d 545 (1975), the

Supreme Court noted the difference between the "good cause" required to vacate a default under *Rule* 4:43–3 and "the more stringent requirements of *R.* 4:50–1 for setting aside a default judgment[.]" *See also* Pressler and Verniero, *supra,* comment on *R.* 4:43–3 (noting the standard for vacating a default is "clearly a less stringent standard than that imposed by *R.* 4:50–1 for setting aside a default judgment").

The trial court's failure to advise M.G. of the correct, and more lenient, standard for setting aside a default does not excuse M.G.'s failure to seek such relief. However, by requiring defendant to prove he had a meritorious defense before he would be allowed to present a defense at trial, the court's instruction effectively diminished the State's burden of proof, allowing its evidence to proceed without meaningful opposition.

## IV

We next turn to the court's decision, over M.G.'s objection,[11] to permit the Division to rely upon the written reports of the psychologists without requiring the Division to produce the experts for cross-examination.

We grant substantial deference to the trial judge's discretion on evidentiary rulings, *Bd. of Educ. of Clifton v. Zoning Bd. of Adjustment of Clifton,* 409 *N.J.Super.* 389, 430, 977 *A.*2d 1050 (App.Div.2009); *Benevenga v. Digregorio,* 325 *N.J.Super.* 27, 32, 737 *A.*2d 696 (App.Div.1999), *certif. denied,* 163 *N.J.* 79, 747 *A.*2d 287 (2000), and will only reverse when the trial judge's ruling was "so wide of the mark that a manifest denial of justice resulted." *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982); *Bd. of Educ., supra,* 409 *N.J.Super.* at 430, 977 *A.*2d 1050. Such a denial of justice occurred here.

---

11 Because counsel did object, this case is distinguishable from *N.J. Div. of Youth & Family Servs. v. M.C. III,* 201 *N.J.* 328, 990 *A.*2d 1097 (2010).

Although it is a matter that lies within the trial court's discretion, we have observed that a defaulting party's opportunity to challenge evidence at a proof hearing, including the right to cross-examine witnesses, "is especially critical where the interests at issue are fundamental, as with parental rights." *N.J. Div. of Youth & Family Servs. v. L.H.*, 340 *N.J.Super.* 617, 619, 775 *A.*2d 125 (App.Div.2001). As we noted in *T.J.B., supra*, 338 *N.J.Super.* at 428, 769 *A.*2d 1071, even if a default is properly entered, "[i]n most default cases, the matter should proceed to a plenary hearing where defendants' counsel and the law guardian *shall have an opportunity to cross-examine DYFS's witnesses.*" (Emphasis added.)

*Rule* 5:12–4(d) permits the Division to introduce "reports by staff personnel or professional consultants" into evidence provided the documents satisfy the requirements of the business records exception, *N.J.R.E.* 803(c)(6) and 801(d). *N.J. Div. of Youth & Family Servs. v. B.M.*, 413 *N.J.Super.* 118, 129, 993 *A.*2d 258 (App.Div.2010).

*N.J.R.E.* 803(c)(6) provides the definition of a business record that constitutes an exception to the hearsay rule:

A statement contained in a writing or other record of acts, events, conditions, and, *subject to Rule 808, opinions or diagnoses*, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

[Emphasis added.]

In an attempt to satisfy those requirements, the psychologists' reports were accompanied by certifications, which stated their records were made in the regular course of business and at the time or within a reasonable time after examining defendants, and Kelly repeated these statements in her testimony.

Although these assertions are necessary prerequisites to a determination whether the reports were admissible as business records, *B.M., supra*, 413 *N.J.Super.* at 130, 993 *A.*2d 258, they

were not dispositive of the question whether the opinions contained therein were admissible. *N.J.R.E.* 803(c)(6) expressly subjects the admissibility of such opinions to the requirements of *N.J.R.E.* 808, which provides:

Expert opinion which is included in an admissible hearsay statement *shall be excluded if the declarant has not been produced as a witness unless* the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

[Emphasis added.]

■ Therefore, when the expert is not produced as a witness, the rule requires the exclusion of his or her expert opinion, even if contained in a business record, unless the trial judge makes specific findings regarding trustworthiness. See *State v. Matulewicz*, 101 *N.J.* 27, 30, 499 *A.*2d 1363 (1985); *Konop v. Rosen*, 425 *N.J.Super.* 391, 403, 41 *A.*3d 773 (App.Div.2012). The trial court failed to make such specific findings here and, we are satisfied, could not have done so on this record.

■ The experts here were consultants retained by the Division to perform evaluations to be used to support its case that M.G.'s parental rights should be terminated. Thus, litigation was not merely contemplated, it was already initiated and the reports were prepared in aid of that litigation. The subject matter of the reports-psychological evaluations and a bonding evaluation-entailed the exercise of subjective judgment rather than a straightforward, simple diagnosis based upon objective criteria or one upon which reasonable professionals could not differ. *See In re Guardianship of K.H.O.*, 161 *N.J.* 337, 346–47, 736 *A.*2d 1246 (1999) (recognizing "the complexity and subjectivity involved in evaluating parental fitness"); *State v. Martorelli*, 136 *N.J.Super.* 449, 454, 346 *A.*2d 618 (App.Div.1975) (citing *McCormick, Evidence* (2 ed.1972), § 313 at 732), *certif. denied*, 69 *N.J.* 445, 354 *A.*2d 642 (1976); *compare Liptak v. Rite Aid, Inc.*, 289 *N.J.Super.* 199, 221–22, 673 *A.*2d 309 (App.Div.1996) (holding that "[t]he diagnosis of alcoholism, a complex medical condition," in a medical

record was inadmissible), *with Blanks v. Murphy,* 268 *N.J.Super.* 152, 164, 632 *A.*2d 1264 (App.Div.1993) (finding hearsay evidence in a medical report was admissible because it constituted a "straightforward observation").

These circumstances militated against a finding that the expert opinion contained in the expert report was sufficiently trustworthy to be admitted without the expert appearing and being subject to cross-examination. It was, therefore, an abuse of discretion to admit the reports into evidence over defendant's objection.

In summary, it was plain error to enter default against M.G. based upon a failure to comply with the orders identified by the court when he had not failed to defend in either the Title 9 or Title 30 proceeding. Although we do not excuse defendant for failing to file a motion to vacate default, the trial court's repeated statement that the default could only be vacated if defendant showed he had a meritorious defense compounded this error by requiring defendant—who had never failed to defend—to prove he had a meritorious defense before he would be permitted to present a defense at a trial. Finally, it was an abuse of discretion to permit the Division to rely upon the written reports of psychological and bonding experts without producing them for cross-examination over the objection of defendant. These flaws combined to deprive M.G. of the fundamentally fair procedures to which he was entitled before an order terminating his parental rights could be entered.

Reversed and remanded. We do not retain jurisdiction.