# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0279-24
A-0280-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.M.,

      Defendant-Appellant/
Cross-Respondent,

and

A.M.,

      Defendant-Appellant.

_____

IN THE MATTER OF
E.M. (DISMISSED), minor,

and

A.M., minor,

      Cross-Appellant.

_____

Argued February 2, 2026 – Decided March 9, 2026

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FN-14-0052-23.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant M.M. (Jennifer N. Sellitti, Public Defender, attorney; Adrienne Kalosieh, on the briefs).

David A. Gies, Designated Counsel, argued the cause for appellant A.M. (Jennifer N. Sellitti, Public Defender, attorney; David A. Gies, on the briefs).

Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Acting Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Jessica A. Prentice, Deputy Attorney General and Wesley Hanna, on the briefs).

Neha Gogate, Assistant Deputy Public Defender, argued the cause for minor cross-appellant A.M. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, of counsel and on the briefs).

PER CURIAM

This appeal stems from findings of abuse and neglect that were largely dependent upon the subjective assessments of a non-testifying child

A-0279-24

psychologist who twice interviewed the child. The interviewer's hearsay opinions set forth in two reports were admitted in evidence by the trial court, over objection, in violation of N.J.R.E. 808 and associated case law.

The child's veracity was a critical aspect of the case because, shortly after being evaluated at a treatment facility, she recanted her initial narrative about being abused and neglected by her parents. Although the Division of Child Protection and Permanency presented expert testimony from a supervising doctor, that expert never examined the child, and had no first-hand knowledge of her oral account of the abuse. To a material extent, the testifying expert's assessment of the child's veracity was informed by the interviewing psychologist's subjective impressions of the child.

Relying substantially on the interviewing psychologist's hearsay impressions as conveyed in the reports and through the testifying expert, the trial court found that the child's parents had committed abuse or neglect under Title Nine. The court accordingly placed the child's two parents on the Title Nine registry.

The parents, joined by the Law Guardian for the child, appeal. For the reasons that follow, we reverse because of the evidentiary error in violating N.J.R.E. 808.

The three appellants were deprived of a fair opportunity to cross-examine the interviewing psychologist about his subjective impressions. The deprivation of that opportunity was unduly prejudicial in this case, in which the veracity of the child's pre-recantation narrative was crucial and in which corroborating proof was absent, or, at best, weak and inadequate.

I.

We briefly summarize the pertinent chronology of events.

The appeal concerns a finding by the Family Part that the child at issue, A.M. ("Amy"), was abused by her father, defendant A.M., and her mother, defendant M.M..[1]

Amy was born in May 2007. She lived in the same household with her parents, her adult older sister and her older brother, E.M. ("Ed").[2]

The family first became known to the Division in 2022, when the Division received reports from Amy's school that her parents allegedly had permitted Ed

[1] To protect the identity of the family members involved, we use pseudonyms for the children used in the briefs. Also to avoid confusion, we refer to the parents by their respective roles, as we note the daughter and father happen to share the same initials, i.e., "A.M."

[2] Ed was initially a named party in this case but was dismissed when he turned eighteen. The older sister was not involved in the case.

to physically discipline her. The Division investigated the accusation and determined those reports of abuse in 2022 were "unfounded."

In February 2023, Amy, who was then age fifteen, alleged in a letter to her teacher that her father had physically abused her the previous night. Amy claimed he had struck and abused her upon discovering she had lied about walking in a nearby park with a boy of whom her parents disapproved.

As the 2023 incident was initially described by Amy, the father called her a "slut" and a "whore." He then threw her on the couch, and he allegedly strangled her until her face turned purple. The mother pulled the father off Amy and sent her to her room, supposedly striking Amy on her back as she retreated. The father grabbed Amy by her hair, threw her to the floor, and threatened to get one of his guns and shoot her. The mother de-escalated the situation and told Amy to lock the door to her room.

Amy stated she had previously lied to the Division in the 2022 investigation and that Ed had, in fact, abused her. Furthermore, Amy claimed a long history of abuse by her father, which she said he had inflicted on her, her mother, and her adult older sister.

A-0279-24

The rest of the family members in the household denied Amy's allegations. In particular, Ed stated that the father had only "lightly" placed his hands on Amy's shoulders and that she had simply fallen backwards onto the couch.

A physical medical examination of Amy conducted two days after the alleged 2023 attack did not document any bruises or injuries.[3] The police investigated the matter and took a recorded statement from Amy, in which she repeated the allegations. The police also conducted a search of the family residence and found multiple guns where Amy said they were stored.

Concerned that Amy may have been in imminent danger, the Division removed her from the family's home and placed her in the care of her maternal grandparents. The Division initially allowed the mother to have supervised visitation with Amy, but it discontinued the visits after Amy claimed the mother had told her during one such visit to retract her allegations.

Amy was referred to a diagnostic center for a psychosocial evaluation. On February 23, 2023, Amy was interviewed there by a pre-doctoral child

---

[3] The record indicates that certain "blue light" photographs were taken of Amy that might have revealed internal bruising. However, those photos were not admitted into evidence because they apparently were supplied too late in discovery to opposing counsel. Additionally, they were submitted without an expert report supporting the photographic technology used.

psychologist.[4] The same day as that interview, Amy's parents were arrested in parallel criminal proceedings stemming from the allegations of abuse.[5]

In addition to examining Amy at length, the interviewing psychologist reviewed more than a dozen Division records, performed a collateral interview with a Division caseworker, and administered several psychological tests. He issued an eighteen-page, single-spaced initial report, which he signed on the final page. The report was co-signed by his "psychology supervisor" at the diagnostic center and by the center's "mental health director."

During her February 23 session with the interviewing psychologist, Amy essentially reiterated the allegations against her parents that she had reported to the authorities, including the father's alleged verbal and physical aggression, his threat to use a gun, and the mother's own involvement in the incident. The interviewing psychologist noted in his report that these accusations were consistent with her reports to the school and others.

---

[4] The interviewer's two reports identify him as a "psychology intern," with a master's degree. Although he is often described in the briefs as an intern, we refer to him variously as "the interviewing psychologist", "the interviewer", or "the examiner."

[5] Eventually, the criminal charges against the mother were dismissed outright, and those against the father were dismissed via pretrial intervention.

A-0279-24

The interviewing psychologist preceded his assessment of Amy with several first-hand impressions. He noted she "presented as a cooperative but anxious adolescent" who "demonstrated an appropriate range of affect, appearing emotional on multiple occasions crying when discussing her family." He further noted she "demonstrated appropriate comprehension of the evaluator's questions and responded articulately." The report detailed what Amy told him about a host of topics, including her family dynamics, her social life, her, relationship with a boyfriend, the 2022 punching incident with Ed, a pattern of alleged violence by her father, drugs and alcohol, her health, her feelings about being physically hurt, the care provided by her grandparents, and her lack of interest in individual therapy.

In a section of his report titled "Summary and Formulation," the interviewing psychologist expressed several clinical opinions. Among other findings, he noted that Amy presented "significant feelings of worry, isolation, and sadness," in the aftermath of the reported choking incident. Diagnostically, he opined that Amy "experiences a number of related trauma symptoms, including hypervigilance, increased startle response, persistent negative mood, and self-blame." He further opined that "[w]hile she lacks the avoidance symptoms necessary for a diagnosis of [PTSD], [Amy's] presentation is

8

consistent with the diagnosis of other specified trauma- and stressor-related disorder."

The interviewing psychologist discerned that Amy "is grieving the sudden loss of contact with both of her primary attachment figures." He elaborated that Amy's "attachments towards her family members may also have played a role in her initial denial [of the abuse], given her grief at the present separation."

After his lengthy discussion, the interviewing psychologist rendered the following clinical conclusions:

> Based on the information provided, the family's presentations throughout [the Division's] involvement, the testing, and the clinical interviews, the following are clinically supported: physical abuse by [the father], psychological abuse by [the father], and physical abuse by [Ed].
>
> [(Emphasis added).]

Notably pertinent to the Rule 808 hearsay issues before us, the examiner added: "Clinical support is based on the client's presentation at the time of the assessment and is in conjunction with the information known at the time." (Emphasis added).

Near the end of the February 23 interview after recounting the acts of abuse, Amy received a telephone call from her grandmother, which the interviewing psychologist allowed her to take. As described by the interviewer

9

in his report, Amy appeared to be "surprised at the contents of the call." He perceived that, "Once the call had ended, her body language and tone of voice briefly became more tense, before returning to a more relaxed state a few minutes later."

Immediately after the February 23 interview ended, Amy confronted a Division case worker about her parents' arrests and stated that she did not want them to go to jail.

Several days later, on March 9, Amy contacted the police department and prosecutor's office and recanted her allegations of abuse. She claimed the events had actually occurred as her brother had described them, and that her father had only lightly pushed her on the shoulders. She denied that the father had threatened her with a gun, claiming she had only mentioned firearms to ensure she would be removed from the home. She explained she had fabricated the allegations so that she could live with friends or other relatives, and thereby avoid her family's strict household rules, particularly as they related to dating boys.

After Amy's recantation, the Division requested that she be given a second psychosocial evaluation at the diagnostic center. The interviewing psychologist accordingly re-examined her on August 1, 2023, issuing an eight-page

10

supplemental report.  Before that interview, he reviewed additional records from the Division and a supplementary investigation report.  "[I]n order to gain more information," the examiner also listened to an audio recording of Amy's recantation to the police, in which she reported that her previous disclosures of abuse "were a lie."

During her second interview with the examiner, Amy declined to answer his questions about the recantation or her grandmother's telephone call to her at the initial interview.  Nonetheless, the examiner expressed several clinical reasons for doubting Amy's recantation.

For instance, the examiner commented:

> During her 3/9/23 statement to [the police], [Amy] said she originally disclosed abuse hoping to leave home and instead live with her friends.  Her desire to live with her friends had reportedly also been stated to [the Division] as of her psychosocial evaluation on 2/23/23.  At the time of that psychosocial evaluation, however, [Amy] had been living with [her grandmother] for more than two weeks, and she still provided a detailed disclosure of multiple instances of abuse.  [Amy] has repeatedly mentioned that [her parents'] arrests go against her wishes.  During her psychosocial evaluation on 2/23/23, her reported statements to [the Division caseworker] of 2/23/23, and her recantation statement on 3/9/23 to [the police], [Amy] mentioned a strong desire for her parents to not be incarcerated.  At the time of that psychosocial evaluation, however, [Amy] reported that [her father] had already been incarcerated, and she still provided an incredibly detailed disclosure

11

of multiple instances of abuse. This timing also conflicts with [Amy's] stated rationale that she fabricated her disclosure as a means to secure services for her family.

[(Emphasis added).]

The interviewing psychologist's second report concluded with the following professional opinions about the credibility of Amy's recantation:

Upon review of all available information, including the timeline of events, it appears likely that [ Amy's] recantation was spurred by a combination of [her mother's] arrest and subsequent pressure from her family. [Amy's] recantation does not eliminate the possibility that abuse occurred.

[(Emphasis added).]

The psychologist added:

It is especially likely that [Amy's] initial disclosures were truthful given her emotionality, extremely high level of detail, and consistency throughout [the Division's] involvement. [Amy] also made statements during the psychosocial interview on 2/23/23 about her desire to keep her family members out of jail, which reduces her possible motivation to fabricate and lends additional credence to the disclosure.

[(Emphasis added).]

He supported those conclusions about Amy's veracity by referring to general principles within his profession:

12

> When abuse is reported within a family system, recantation is <u>often an artifact of familial pressure on an adolescent to recant</u> their disclosure in order to preserve the family system or prevent legal involvement.
>
> [(Emphasis added).]

Despite Amy's recantation, the Division elected to litigate the Title Nine charges against the parents. A Family Part judge conducted a Title Nine fact-finding hearing over three non-consecutive days between January and April 2024. Both the father and the mother appeared and were each represented by counsel. Amy was represented by a Law Guardian, who likewise argued against a finding of abuse or neglect. Amy did not testify, nor did her parents.

The Division presented background testimony from Amy's teacher and a case worker, neither of whom had personally witnessed abuse or neglect. In addition, the Division's main trial witness was the child psychologist ("the testifying expert"), who was a supervisor at the diagnostic center.

For reasons that are not entirely clear, the Division did not call the interviewing psychologist as a witness at the Title Nine trial.[6] Instead, the sole psychologist presented as a trial witness was the examiner's supervisor.

---

[6] The record intimates that the interviewing psychologist had completed his internship and thesis, but there is no indication as to what, if any, attempts the

As shown by his curriculum vitae in the record, the testifying expert has extensive experience and credentials in the field of child psychology. His general qualifications as an expert were stipulated to by all three opposing counsel. He has a Ph.D. in counseling psychology, and he has practiced in the field for over two decades. For the past twenty-five years he has been both a provider of psychological evaluations at the diagnostic center, and a supervisor of other mental health professionals who perform evaluations there. He has testified as an expert numerous times.

In his testimony, the expert described the "treatment team" arrangement the center uses. In his role as a supervisor, the expert trains new professionals in interviewing techniques and suggests to them topics to plan to ask about before the interviews. He reviews clinical, investigatory, medical, and court documents and discusses their significance with his supervisees. For the instances in which the supervisee conducts the patient's interview, the expert reviews the interviewer's draft report, and at times suggests revisions. If he approves the report, he co-signs it.

---

Division or its trial counsel made to locate him and obtain his trial testimony, either remotely, in person, or via a de bene esse videotaped deposition.

A-0279-24

In the present case, the testifying expert did not examine or meet Amy. Nor did he listen to the audio recording of her recantation to the police, relying instead on the examiner's written account of that recording. The testifying expert did personally conduct a collateral interview with Ed. It does not appear that the expert generated his own written report but instead referred in his testimony to various portions of the interviewing psychologist's two written reports from February and August 2023.

Counsel for the parents and the Law Guardian objected to the court admitting the expert's testimony, arguing it was improperly based upon the hearsay opinions of the interviewing psychologist. The court overruled the objections. The court noted it had presided over past Division cases in which other defendants had objected to the "team approach" of psychological interviews, and that in those cases it had allowed opinion testimony by experts who had relied on hearsay reports by other members of the treatment team.

In its oral decision on the merits, the trial court concluded that child abuse had occurred and was corroborated by the written reports and the expert's testimony. The court further concluded that Amy's allegations of previous abuse at the hands of her brother, in 2022, and father, during multiple unspecified periods in her life, had occurred. Noting the timeline of events between Amy

A-0279-24

discovering her parents' arrest and her recantation, the court determined her recantation was not credible and likely was the result of her desire to protect her family.

By a preponderance of the evidence, the court concluded the father had abused and neglected Amy in violation of N.J.S.A. 9:6-8.21(c)(4). The court additionally found that the mother had abused and neglected Amy by striking her on the back during the 2023 incident and by failing to contact the authorities.

As a consequence of the court's findings, both parents were placed on the Child Abuse Registry, pursuant to N.J.S.A. 9:6-8.11. Thereafter, the parents complied with Division-mandated services and Amy ultimately was reunified with her family. As a result, the Title Nine case was terminated in August 2024. Since then, Amy has reached the age of majority.

## II.

On appeal, defendants and the Law Guardian all urge that the findings of abuse or neglect be reversed and that the parents be removed from the Registry. Fundamentally, they argue: (1) the examiner's reports containing hearsay opinions and the expert's testimony were inadmissible, because the complexity of the psychological diagnosis in this case required the interviewing psychologist to testify and be cross-examined pursuant to N.J.R.E. 808; and (2)

16

Amy's out-of-court statements were not sufficiently corroborated to support a finding of abuse.

In addition, the mother argues she should not have been found to have abused Amy when she intervened in the 2023 incident and protected her child. The father, meanwhile, argues the court erroneously failed to connect his actions to any harm to Amy, and should have analyzed the reasonableness of his conduct in light of his discovery that Amy had lied to him about breaking household rules concerning dating.

It is well settled that to establish a violation of Title Nine, the Division has the burden of showing by a preponderance of competent, material, and relevant evidence "that the child is an abused or neglected child." N.J.S.A. 9:6-8.46. Abuse or neglect occurs when:

> [a] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c)(4).]

A-0279-24

"Abuse and neglect cases are generally fact sensitive," and the court must consider the totality of the circumstances in determining whether the Division has met its burden of proof. See N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33-34 (2011).

In a Title Nine hearing, a child's out-of-court "previous statements . . . relating to any allegations of abuse or neglect shall be admissible in evidence." N.J.S.A. 9:6-8.46(a)(1)(4). However, a child's statements must be sufficiently corroborated for a finding of abuse to be made. P.W.R., 205 N.J. at 33. A confession or admission by a defendant is the most effective form of corroboration. N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002). However, because "[i]t would be a rare case where evidence could be produced that would directly corroborate the specific allegation of abuse between the child and the perpetrator," indirect or circumstantial evidence that provides  support for the child's allegations can serve as adequate corroboration. Id. at 435-36. This indirect evidence can include scientific or psychological expert evidence demonstrating either the physical or emotional ramifications of the alleged abuse. N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 587-88 (App. Div. 2015).

Consistency in a child's statements "alone does not constitute

corroboration." N.J. Div. of Child Prot.& Permanency v. N.B., 452 N.J. Super. 513, 523 (App. Div. 2017); see also N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) ("The mere repetition and consistency of [a child's] statements are insufficient to support a finding of corroboration under N.J.S.A. 9:6-8.46(a)(4)").

Furthermore—and especially pertinent here--the corroborative evidence must be separately admissible. N.B., 452 N.J. Super. at 524 (reversing a finding of abuse and neglect after determining that an expert report was inadmissible under N.J.R.E. 808 and the only admissible evidence was the repetition of the child's allegations).

The pivotal issues before us are evidential in nature. At the heart of those issues is the propriety of the Division relying substantially on the hearsay opinions of the non-testifying interviewing psychologist to support its case in chief. The analysis is informed by both the Court Rules governing child welfare cases brought by the Division and the pertinent Rules of Evidence.

According to Rule 5:12-4(d), the Division may submit into evidence in child welfare cases "reports by staff personnel or professional consultants" provided those reports satisfy N.J.R.E. 803(c)(6), otherwise known as the business records exception to hearsay, and N.J.R.E. 801(d), which broadly

defines a "business" under that exception to include non-profit organizations and government agencies.

N.J.R.E. 803(c)(6) provides that a hearsay record may be admissible "if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or record." However, with respect to "opinions or diagnoses" that business-record exception is expressly made "subject to [Evidence] Rule 808."

N.J.R.E. 808, in turn, directs that:

> Expert opinion that is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness. Factors to consider include the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion.
>
> [(Emphasis added).]

In their briefs on appeal, appellants all argued that the subjective opinions of the interviewing psychologist were inadmissible under Rule 808 because they entailed complex diagnoses and subject matters and were not sufficiently trustworthy (nor found by the court to be) to be admitted without an opportunity to cross-examine the interviewer   Relatedly, appellants maintain that the

Division's testifying expert was used here as an improper conduit for the inadmissible hearsay opinions of the interviewer, and the trial court should not have relied on that evidence in its factual findings.

The Division's responding brief on appeal did not discuss Rule 808[7] but instead invoked N.J.R.E. 703, which provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
>
> [(Emphasis added).]

In overruling appellants' objections to the hearsay within the interviewing psychologist's reports, the trial court relied on the "facts or data" facet of N.J.R.E. 703. It did not address the prohibition within N.J.R.E. 808 on admitting or relying upon complex disputed opinions expressed by experts within hearsay reports. Nor did the trial court make any express findings of the trustworthiness of the embedded opinions, although we can readily infer from the court's

---

[7] We invited the Division after the appellate argument to submit a supplemental brief on the Rule 808 issues and have considered that additional brief and the opposing submissions.

A-0279-24

colloquy that it regarded them as sufficiently trustworthy to be used by the testifying expert.

With all due respect to the trial court, the admission and reliance upon the examiner's subjective assessments of the child in this case were not in conformity with Rule 808 and associated case law.

Applying Rule 808 to a child welfare case in N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 501 (App. Div. 2016), we held that a non-testifying psychologist's report diagnosing a child with PTSD was inadmissible because the diagnosis relied on "subjective judgment and complexity." In particular, we noted that "psychological evaluations generally 'entail [] the exercise of subjective judgment rather than a straightforward simple diagnosis based upon objective criteria or one upon which reasonable professionals could not differ.'" Ibid. (alterations in original) (quoting N.J. Div. of Youth & Fam. Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012)).

Generally, an expert medical opinion is inadmissible under N.J.R.E. 808 "because of the complexity of the analysis involved in arriving at the opinion and the consequent need for the other party to have an opportunity to cross-examine the expert." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. B.M., 413 N.J. Super. 118, 130 (App. Div. 2010)). Because the Family Part in N.T.

22

admitted the report without making particularized findings as to its trustworthiness, we concluded the court had misapplied its discretion. Id. at 506.

Similarly, in A.D., 455 N.J. Super. at 159 (citing James v. Ruiz, 440 N.J. Super. 45, 73 (App. Div. 2015)), we ruled that a non-testifying expert's report that found a child had been sexually assaulted was inadmissible under Rule 808 because it was "sufficiently complex and controversial." Although the opinions and conclusions in the hearsay report were inadmissible, factual statements within it such as the fact that the child's hymen was not intact were admissible. Id. at 160.

Additionally, we have further noted in another child welfare case that when an expert report entails "the exercise of subjective judgment rather than a straightforward, simple diagnosis based upon objective criteria or one upon which reasonable professionals could not differ" and the reports are prepared in aid of litigation, it is more difficult to find these reports trustworthy without the expert who wrote the report appearing for cross examination. M.G., 427 N.J. Super. at 174-75.

Here, although some portions of the interviewing expert's two reports contain factual information (such as, for example, biographical details about

23

Amy and the numerical results of her psychological tests), substantial portions convey opinions about the veracity of her original narrative and the non-veracity of her recantation. Those opinions are complex and tied to the interviewer's diagnoses, which were listed with DSM codes in his reports.

In his second report, the interviewer presented very specific and pointed opinions—which we have quoted above--about why Amy's original account was, clinically, more likely to be true than her later recantation. All three appellants dispute those opinions. Although the interviewer did not diagnose Amy with PTSD as in <u>N.T.</u>, his diagnosis of "other specified trauma- and stressor-related disorder" (DSM 309.89, 43.8) is similarly complex and disputed. It was unfair to appellants to deprive them of a chance to cross-examine the interviewer and probe into his first-hand impressions of the child.

By analogy, this court recently noted, in a published criminal case, the quagmire of admitting hearsay findings of a non-testifying subordinate through the trial testimony of a supervising expert. <u>See</u> <u>State v. K.W.</u>, __ N.J. Super. __, __ (App. Div. 2025) (slip op. at 31). Generally, it does not violate the Confrontation Clause in criminal cases for a supervisor to testify about the work of a subordinate in conducting certain scientific tests, provided "the supervisor is knowledgeable about the testing process, reviews scientific testing data

produced . . . and prepares, certifies, and signs a report setting forth the results of the testing." Ibid. (quoting State v. Michaels, 219 N.J. 1, 6 (2014)). However, although supervisors may render their own conclusions on the results of those tests that depend to some degree upon the work of a subordinate, the supervisor may not constitutionally serve as a conduit for the subordinate's hearsay opinions that cannot be cross-examined. Id. at __ (slip op. at 35). See also Smith v. Arizona, 602 U.S. 779, 802 (2024) (underscoring that principle). That same quagmire exists here in this civil context. In any event, Rule 808 and our case law applying it provide ample non-constitutional grounds for reversal.[8]

In concluding that Amy was abused, the interviewer substantially relied on her demeanor and emotionality such as noting that she appeared "anxious", her fear at returning home and her "hypervigilance, increased startle response, persistent negative mood, and self-blame." The psychologist's trained

---

[8] We are unpersuaded by the unreported opinions cited to us by the Division in its post-argument brief, as none of them are factually comparable. Moreover, our own research has identified at least one unpublished opinion from 2018—involving a subordinate's interview reports coincidentally from the same diagnostic center as in this case—in which we held that complex and disputed opinions within those hearsay reports about a child's recantation could not be admitted through a testifying supervisor. We do not cite any of these unpublished opinions, in compliance with Rule 1:36-3, and appreciate that we are not bound by them.

A-0279-24

observation of the child's demeanor was manifestly important to the first report's conclusion that she had suffered physical abuse. Furthermore, her demeanor when she answered the phone call during the first interview, which only the interviewer witnessed, was instrumental to determining whether Amy's recantation was credible or due to familial pressure.

Although the testifying expert's opinions were not in all respects identical to those of the interviewing psychologist, they were clearly informed and influenced by the interviewer's hearsay subjective observations. As the Division's brief acknowledges, that expert's testimony was based in part upon the interviewer's impression of Amy's "change in affect" at the second interview.

The court's evidential error was not inconsequential. As we noted in Part I, no third-party eyewitness corroborated Amy's initial accusations. No photos were admitted into evidence that revealed marks or bruising; additionally no injuries were detected by medical reports. Neither parent made corroborating admissions. The interview of Ed added little, if anything, to substantiate the Division's case. The police seizure of firearms at the residence does not prove that the father brandished a gun at Amy, and her initial account that he had threatened to fire it at her is uncorroborated by any witness. Since Amy knew her father owned a gun, she could have readily fabricated the spoken threat for

A-0279-24

the purposes we have discussed above.

For these many reasons, we vacate the trial court's decision and direct that the parents be removed from the Registry within forty-five days. We discern no reason to remand for a new hearing since Amy has now reached the age of majority.

Vacated and remanded.[9]

I hereby certify that the foregoing is a true copy of the original on file in my office.

*m.C. Hasley*

Clerk of the Appellate Division

---

[9]  To the extent that our disposition may pose practical difficulties for the diagnostic center and other similar facilities that utilize a "team approach" to treatment, we suggest that in the future it may be prudent, if feasible and not clinically contraindicated, to have child interviews recorded on closed-circuit video, so that a supervising expert testifying at trial will be able to see and hear the child's recorded statements. The topic may also be suitable for consideration by the Supreme Court's respective Committees on Family Practice and Evidence, and we invite counsel to present it to those Committees, with a copy of this opinion.

A-0279-24